This is a judgment creditor's bill. Kemp Epstein, partners, conducted the "Silk Shop" in Plainfield from 1924 to *Page 15 
June, 1931, when a fire brought the partnership to an end. In the previous December (1930), Kemp conveyed his home to his wife. A few weeks later Epstein transferred his dwelling to his wife. They also transferred to them their automobiles. At that time the co-partnership stock in trade was estimated at $18,000, their debts at $4,000 to $5,000. When the fire occurred in May, their debts were $9,000; they had purchased for the spring trade. They collected insurance of $11,250, had a fire sale that yielded $2,000, paid their debts and quit. The excess of assets was divided and used to pay their personal debts. The complainant was their landlord; they paid their rent until the fire. They were under a five-year lease at $350 a month and after they vacated, the complainant recovered three judgments in the district court for three months' rent, approximately $1,200, and then filed this bill to set aside the two conveyances and the transfers of the automobiles, charging that they were made with intent to cheat and defraud creditors, c.
I have no doubt that the conveyances were voluntary. The wives, it appears, brought to their husbands some money at marriage and, it may be, that the moneys were used to pay some part of the purchase prices, but whatever and however the contributions, they were obviously gifts and the conveyances to them were return gifts, and this conclusion is not seriously controverted.
As voluntary conveyances, they are not vulnerable to attack under the Uniform Fraudulent Conveyance act of 1919 (Cum. Supp.Comp. Stat. p. 647), assuming that the complainant was at the time a creditor within the meaning of that act. The properties were not partnership assets, though secondarily liable for partnership debts, and the partnership assets at the time were greatly in excess of partnership debts, so that the conveyances did not render the partnership insolvent.
The capital of the partnership being unimpaired by the conveyances, they do not come under the ban of section 5 of the act of 1919, in leaving an unreasonably small capital in the business. *Page 16 
The remaining question is whether there is proof that there was fraudulent intent. The business had been bad for quite a spell, but nothing untowards happened until the fire. The business went on as before, sales continued and new stock was laid in. The partners had asked for a reduction in rent and had been refused. It was paid less promptly, but nevertheless paid up until the fire. Unless we assume that the fire was incendiary and anticipated at the time of the conveyances, it cannot be reasoned that there was a preconceived intention to cheat, an intention to defeat the lease and to evade the payment of the rent after the fire. We cannot assume; we cannot surmise. Fraud must be proved, and there is no proof of relation between the two incidents, nor established facts from which a connection may be inferred. Times were hard and the business was losing out when the conveyances were made, but the firm had aplenty, and paid all debts. The liability under the lease was contingent; there was no debt due the complainant. The contingency of a tenant's liability under a lease was remarked by Mr. Justice Case in Block v. BellFurniture Co., 111 N.J. Eq. 551, and the logic is to be found in the cases there cited. A tenant's contingent liability is adverted to, not that it affords an escape to responsibility, but merely as indicating the greater difficulty of finding an actual intention to defraud creditors where the motive is remote than where a debt exists and the urge is present. And so it was under the rules of evidence before the modification of the Fraudulent Conveyance act in 1919. A voluntary conveyance was conclusively presumed to be fraudulent as to existing debt, while no such presumption arose where the liability was contingent. Severs v.Dodson. 53 N.J. Eq. 633.
The bill will be dismissed. *Page 17