Belfus agreed, July 15th, 1929, to purchase a house from Joachim and was decreed to perform (Joachim v. Belfus,107 N.J. Eq. 240; 108 N.J. Eq. 199, 622), and, defaulting, a money decree was taken against him and the house was sold and purchased by Joachim at a nominal figure, leaving a deficiency of $12,000. Belfus went into bankruptcy to escape the debt. He listed $14,500 of liabilities, of which $12,500 was Joachim's decree, and nominal assets.
1. Krafte, trustee in bankruptcy, filed a bill to compel Mrs. Belfus to account for $4,500, one-half the proceeds of sale of a house in Stratford place, Newark. Title to the property had been in Belfus and wife and Friedland and wife since 1918. In September, 1929, the Belfuses sold their interest to the Friedlands and Mrs. Belfus got the price, as she asserts, because it was with her money the half interest was bought. Whether that be true or not is immaterial. There is not a thing to justify even a suspicion that if Belfus gave the proceeds to Mrs. Belfus he did so with intent to cheat creditors and especially Joachim. On the contrary, he was at that time disputing Joachim's title and claiming a return of his down-money. And the circumstances do not show a constructive fraud under the Uniform Fraudulent Conveyance *Page 209 
act. Cum. Supp. Comp. Stat. p. 647. Belfus was then a trader in second mortgages, speculated in real estate and was in good financial condition, and the gift, if that is what it was, did not render him insolvent. Kearny Plumbing Supply Co. v. Gland,105 N.J. Eq. 723; Finger v. Kemp, 112 N.J. Eq. 14; TrustCompany of Orange v. Garfinkel, 107 N.J. Eq. 20. The bill will be dismissed.
2. The second suit by the trustee is to recover from the defendant Rubin a $3,000 second mortgage made to him by one Cooperman, July 1st, 1931. Belfus at that time owned a $3,000 second mortgage on Cooperman's property which he canceled when the Rubin mortgage was given. Rubin gave Cooperman his check for $3,000, Cooperman endorsed it to Belfus and it was paid by the bank. Rubin deposited $3,169 in cash July 1st, 1931, the day the check was drawn. Did Belfus furnish the cash to meet the check? That is the question.
Belfus at the time was vigorously resisting Joachim's suit; he had by then made away with most of his property. Rubin is a small shopkeeper in Newark. He says he kept $1,000 in a black metal box in his bedroom in the rear of his store, to cash checks for customers — it helped along business. To make up the $3,000 for Cooperman's mortgage, he borrowed $1,500 from his sister in New York (the sister was not called), which he also kept in the box, and the balance was gathered from other sources. Now let us pause: Rubin at the time had a safety deposit box; he also had a bank account, and it was active during June. He made eight deposits, $372, $255, $260, $453, $344, $250, $300.18 and $125, the last two on the 30th. Yet he chose to risk $2,500 in the tin box? The tin box story is not original.
The rest of the story is quite as fanciful. Rubin was not a money-lender nor an investor in second mortgage loans. He did not know Cooperman and had but a passing acquaintance with Belfus. Cooperman did not seek the loan, nor did Belfus; Belfus simply called a few times on Rubin to recommend it. Rubin did not know Belfus held a mortgage on Cooperman's property and that he was substituting for *Page 210 
Belfus. The property was not appraised; Rubin looked at it, but he was not a judge. (Property had no market value, there was no market in July, 1931.) Belfus' mortgage had nine months to run; Rubin's mortgage is for one year and nine months. Interest and amortization of $250 in March and September, were conditions of Belfus' mortgage; so were they on Rubin's. Cooperman's compensation for his part was a year's extension. Rubin got none, no bonus, nothing, and was so unfamiliar with the mortgage business as not to know that at that time, in the depth of the real estate depression, when money on first mortgages was at a premium or altogether unobtainable, second mortgages were being hacked about at heavy discounts. And this second mortgage, of precarious value, as to the virtue of which he had no assurance, the title to which he knew nothing about, of a bondsman he did not know, was "attractive" because, as he says, it brought six per cent. and a $250 installment was payable in September. Let us again pause: What of the $1,000 in cash he was so anxious to have handy for the convenience of his customers, and what of the harm to his trade when he could no longer cash their checks? Why borrow from his sister at six per cent. to loan at the same rate to a stranger? Why the hazard without gain? Is this the solution? Jacob I. Kaplan, a lawyer, "found" Rubin for Belfus. The deal was transacted in his office. He closed it without an examining of the title as to ownership or prior liens. Kaplan's explanation, that when he put the Rubin mortgages on record July 6th, he found an earlier undischarged mortgage by Cooperman to Belfus and had Belfus execute a second satisfaction piece to include its discharge, prompts the query: Why, if his client Rubin was parting with money, and the affair was not a mere shift, did he not take the commonest of precautions of first searching the title? The ingenious scheme, as stupid as it is transparent, was not Rubin's invention, nor conceived by Belfus, though both were apt pupils. It's a good trick if it works.
To ease our mistrust in Rubin's whimsy, of having deposited his own money to meet the Cooperman check, his *Page 211 
counsel refers us to a previous occasion, in 1926, when Rubin is said to have loaned $1,550 to one Bressel upon chattel mortgage, and to meet his check deposited the cash the same day. We fail to see its relevancy. Had the complainant made the offer, we might have suspected an effort to show that Rubin was not an inexperienced hand in doing a good turn for a friend or for a price.
The contention that the complainant having called Belfus, Rubin and Kaplan as his witnesses, vouched for their integrity and is bound by their uncontradicted testimony, with modifications, is the law. Carluccio v. Winter, 108 N.J. Eq. 174. But the testimony must be coherent, believable evidence. The truth may be found in its corruption, and fraud uncovered by its falsity.
Rubin will be decreed to surrender the mortgage.
3. Joachim filed a petition in his specific performance suit, to adjudge Belfus guilty of contempt for failure to pay the deficiency judgment, the gravamen being that he fraudulently disposed of or concealed his property to avoid payment, and the relief asked is that he be imprisoned until he pays.
Belfus stripped himself after Joachim started in pursuit. His wife got $4,500, the proceeds of the Stratford place property; Rubin got the Cooperman $3,000 mortgage and Belfus says he paid his brother-in-law $5,500 and his brother $2,000 in discharge of debts. He had additional moneys and securities of $5,000 and more, which he claims to have used up in living expenses in the past few years.
Brown was Belfus' partner in the lending of money on second mortgages — so says Belfus. Brown, a workman, started to contribute way back in 1920, fifty, a hundred, two and three hundred dollars as he saved it — all in cash? No record was kept; Brown trusted him and Belfus knew it totaled $5,500 in 1931? In May, 1931, he paid Brown $4,000 and later $1,500 in cash, and took no receipt? Brown died in November following, impecunious. The story brands itself.
With the brother, it was the same. The loans were in small sums over a period of many years? Belfus kept the total in his head? In 1931, when he was hopeless of escaping Joachim, he paid his brother $2,000? And then bankruptcy. *Page 212 
Belfus' refusal to pay the decree is not a contempt, remediable by imprisonment. It falls within the constitutional provision abolishing imprisonment for debt. Aspinwall v. Aspinwall,53 N.J. Eq. 684.
Were these proceedings on a turnover order in supplemental proceeding, disobedience would have been contempt, enforcible by imprisonment. Likely, it was such an order Vice-Chancellor Stevenson had in mind in Smith v. Smith, 84 N.J. Eq. 299.
Commitment in such circumstances, while its object is to enforce the payment of money, is not imprisonment for debt.
Relief in this court is not available to Joachim, now that Belfus is a bankrupt. Title to the concealed property is in the trustee. His remedy is in the bankruptcy court. The petition will be dismissed.