270 N.J. Super. 628 (1994)
637 A.2d 944
ABRAHAM SCHLUSSEL, PLAINTIFF-APPELLANT/CROSS-RESPONDENT,
v.
EMMANUEL ROTH CO., K/N/A ERC LIQUIDATING CORP., A NEW JERSEY CORPORATION, DEFENDANT, AND NOVTEX CORPORATION, A NEW YORK CORPORATION, DEFENDANT-RESPONDENT/CROSS-APPELLANT, AND DANIEL BIRD, JOHN CARPENTER AND CARL FUNKE, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued December 13, 1993.
Decided February 7, 1994.
*630 Before Judges PETRELLA, CONLEY and VILLANUEVA.
David O. Marcus argued the cause for appellant-cross-respondent (Shapiro & Shapiro, attorneys; Mr. Marcus and Robert P. Shapiro, on the brief).
Charles A. Strenk argued the cause for respondents-cross-appellants Bird & Novtex Corporation (Kiernan & Strenk, attorneys; Mr. Strenk, on the brief).
*631 Eugenie F. Tendrich argued the cause for respondents Carpenter and Funke (Rabner, Allcorn & Meislik, attorneys; Mr. Tendrich, on the brief).
The opinion of the court was delivered by CONLEY, J.A.D.
Plaintiff landlord appeals the dismissal of his claim under the Uniform Commercial Code Bulk Transfer Act, N.J.S.A. 12A:6-101 to 6-111, for rental payments not due and owing at the time of transfer of the assets of his tenant, defendant Emmanuel Roth Co. (Roth), to defendant Novtex Corporation (Novtex). The claim was rejected by the trial judge on the basis that plaintiff was not a creditor within the meaning of the act as to future rents at the time of transfer. Plaintiff also appeals a judgment entered in his favor for a rentor's lien pursuant to N.J.S.A. 2A:44-165 to  167 in the amount of rent that was due as of the date of transfer reduced by the amount of Roth's security deposit. Finally, plaintiff appeals a no cause jury verdict on his claims against defendant Daniel Bird, president of Novtex, and defendants John Carpenter and Carl Funke, shareholders of Roth, for their alleged fraudulent misrepresentations that Novtex would assume the lease and alleged concealment of the removal of Roth's assets and business from the premises. Novtex cross-appeals from the rentor's lien judgment. We affirm the dismissal of the bulk transfer act and fraud claims and modify the rentor's lien judgment to remove the security deposit reduction.
In October 1980, plaintiff and Roth executed a five-year lease for a portion of plaintiff's industrial building in Carlstadt. In October 1985, the lease was modified and extended to October 1995. As modified, the lease provided for an annual lease rent of $76,483.00 payable in monthly installments of $6,373.58, with a rent adjustment every two and one-half years. In addition, the lease provided for payments of a percentage of certain expenses, including taxes, insurance and maintenance of common areas. *632 The monthly rent was due the first of the month, but if not paid by the fifteenth of each month, a late charge would be assessed.
Pursuant to Article 15 of the lease, a default in payment of its rental obligations under the lease would occur if Roth failed to make such payments upon ten days written notice by plaintiff. Upon such default, plaintiff could terminate the lease upon five days notice, enter and repossess the premises. If so terminated, the lease established damages as either "[a] sum which represents any excess of (i) the aggregate of the rent, impositions and additional rent for the balance of the term if the Lease was not so terminated, over (ii) the net rental value of the demised premises at the effective date of such termination, both discounted at the rate of four percent (4%) per annum" or, at plaintiff's option, "[s]ums equal to the rent, impositions and additional rent, when the same would have been payable if not for such termination, less any net rents received by Landlord, from any reletting, after deducting all costs incurred in connection with such termination and reletting...."
Roth produced and distributed narrow fabric and trimmings at the premises. In December 1986, Carpenter and Funke purchased all of Roth's stock, and continued to operate the business. They received loans from Chemical Bank to finance this acquisition and Chemical Bank obtained a security interest in Roth's assets, which was perfected in 1987. By September 1988, the company was in financial trouble. One of the rent checks to plaintiff had bounced and, in Carpenter's words, the business was borrowing from Peter to pay Paul. Carpenter and Funke did not want to file for bankruptcy, and their alternatives were either finding a partner to allow them to continue to run the business or identifying a purchaser for the business.
In October 1988, Carpenter and Funke advised plaintiff by letter that they were seeking his help in marketing their premises. Plaintiff promoted the availability of the space to the brokerage community and Roth advertised it in the newspaper. Roth also showed the space to potential lessees.
*633 During that time, Novtex emerged as a potential buyer for Roth. On November 9, 1988, Carpenter, Funke and Novtex entered into an agreement for purchase of assets. Pursuant to that agreement, Novtex assumed responsibility for all of Roth's orders, including back orders and future orders, and for its inventory. It also assumed leases for five automobiles, for Xerox, telex and postage equipment, and for the telephone system. Novtex did not assume the lease with plaintiff.
Also during this November 1988 time period, Bird, Funke and Carpenter met with plaintiff's son, Marc Schlussel. Most of the evidence presented to the jury on the fraud counts[1] focused on whether Bird did or did not state at this meeting that, if and when the Novtex purchase was consummated, Novtex would assume Roth's lease and operate the business from Carlstadt.
The respective versions of events are as follows. Marc Schlussel contended that Bird never informed him during the meeting that the acquisition was an asset purchase only; Schlussel believed that the business would continue just as it had when Carpenter and Funke had taken over. However, Schlussel never asserted that Bird made an express representation that Novtex would assume the lease. Schlussel stated only that Bird had assured him that rent arrearages would be paid.
In contrast, Bird was emphatic that he explained to Schlussel that Novtex was completing an asset purchase of Roth, would move Roth's equipment to Massachusetts, and had no interest in plaintiff's lease. Carpenter similarly recalled that Bird had always referred to the Roth acquisition as an asset purchase. He elaborated that the purpose of the November meeting was to assure Schlussel that, despite the bounced checks, the rent would be brought up to date.
Indeed plaintiff acknowledged that he knew that Novtex would move the company to Massachusetts at some point, but denied *634 that Bird told him the move would occur before February 1989. A December 30, 1988 letter from plaintiff, however, to Carpenter and Funke reiterated the parties' arrangement for advertising the space and plainly reflected plaintiff's awareness of Roth's desire to terminate the lease "as quickly as possible." In that letter, plaintiff asked only that "should your plans change and you no longer desire to terminate the existing lease as quickly as possible please contact landlord immediately."
As of November, Roth was behind on the October and November rents and taxes. On November 18, 1988, plaintiff sent Roth a notice advising that it was "in default in payment" for a total of $15,289.00  including the October and November rent payments, fourth quarter real estate taxes and late fees. The notice concluded that if the default was not cured in full within ten days plaintiff would exercise all rights legally available. With monies advanced by Novtex, these arrearages were paid, in addition to the December rent. As of the end of December, plaintiff had received from Roth, advanced by Novtex, $22,133.00, representing rental payments for October and November, late fees and fourth quarter real estate taxes, in addition to December's rent.
The closing between Roth and Novtex occurred on January 13, 1989. As of that date, the January rent had not been paid and late fees for December's rent as well as maintenance fees had also not been paid. On January 11, 1989, plaintiff sent Roth notice of the total amount owed ($10,622.00). This notice was not received by Roth, however, until January 17 and pursuant to the lease, a default by Roth would not have occurred until January 22, 1989.
The total consideration paid by Novtex for the assets of Roth purchased by Novtex was $401,840.00. That amount consisted of (1) $170,000.00 paid to Chemical Bank on its secured loan (2) $151,775.00 in accounts payable of Roth which were expressly assumed and paid by Novtex, and (3) $80,065.00 in loan advances by Novtex to Roth between November 1988 and January 13, 1989, including the $22,133.00 paid to plaintiff. Additionally, at the closing of the transaction between Roth and Novtex it was determined *635 that the total indebtedness of Roth to Chemical was $206,657.00. In order to pay Chemical's secured loan, Carpenter and Funke personally borrowed from Novtex $36,657.00 which was paid by Novtex to Chemical Bank to make up the deficiency. After the closing and prior to payment of Roth's accounts payable, Novtex sent a letter to each creditor to verify the accuracy of the information as to the amounts owed by Roth. It has never been disputed that all of the proceeds of the sale were paid by Novtex entirely to Roth's various creditors.
By the end of January 1989, Novtex moved all of Roth's equipment to its facility in Massachusetts. Roth paid no other rent to plaintiff. By written notice dated January 22, 1989 and effective January 26, 1989, plaintiff terminated the lease for nonpayment of the January rent, December late charges and maintenance expenses. The premises were rented to a new tenant in January 1990, but for less rent.
Pursuant to the liquidated damages provision of the lease, plaintiff calculated his damages as (1) $85,556.00 unpaid base rent for 1989 plus interest of $83,422.00, (2) expenses as a result of the termination and reletting in the amount of $50,636.00 plus interest of $36,655.00, and (3) rental shortfall (the difference in the Roth rent and the new lease) of $137,285.00. No party has ever disputed these amounts and a judgment for $393,554.00 was entered against Roth.

I.
Contending that he was a creditor of Roth at the time of the transfer of its assets, plaintiff claims he was entitled to notice of the transfer and to share in the proceeds that were distributed by Novtex to Roth's other creditors. He argues that Novtex, as a transferee of all of Roth's assets, is responsible for what would have been his share of the proceeds which he contends is $99,930.00 or 63.4% of that amount of the proceeds that was distributed to Roth's unsecured creditors.
*636 As we have said, the trial judge disagreed, a conclusion with which we are in agreement. But an understanding of our agreement requires a fairly extensive review of the critical provisions of the Uniform Commercial Code Bulk Transfer Act and the many cases decided thereunder as well as cases decided under pre-code acts. Because the act is a uniform act adopted in most states, and because there is a dearth of cases in New Jersey on the critical issue with which we are concerned, we have found it necessary to consider other states' cases.
Before we commence this task, however, we think it somewhat pertinent to make several observations: 1) aside from plaintiff's rentor's lien claim, with which we deal later, and his bulk transfer act claim, plaintiff has no basis to recover any part of Roth's lease obligations from Novtex, for it is plain Novtex did not assume any liability for the lease, and 2) by virtue of the jury's rejection of plaintiff's claim of fraudulent misrepresentations, we assume, to the extent it is at all critical, that Novtex's version of what transpired at the November 1988 meeting was accepted by the jury and that at that meeting Novtex told plaintiff that it was purchasing Roth's assets and that it was going to relocate the business to its facility in Massachusetts. Novtex made it clear it was not going to assume Roth's lease and was going to move from the premises as soon after the closing as possible, but "no later than February." Plaintiff thus knew at least two months before the transfer occurred, that Roth would vacate the leased premises by the end of January 1989.
Bulk sales legislation was originally enacted around the turn of the century in response to a fraud perceived to be common: a merchant would acquire his stock in trade in credit, then sell his entire inventory and abscond with the proceeds, leaving creditors unpaid. See Prefatory Note to U.C.C. Revised Article 6 (Bulk Sales), 2C U.L.A. 6 (1991). Creditors had little recourse because the transfer of the goods to an innocent buyer immunized them from the reach of the seller's creditors and, even if the merchant could be found, in personam jurisdiction over him might not have *637 been readily available. Ibid. When the American Law Institute adopted a proposed Uniform Commercial Code in 1950's, it observed that the central purpose of the various states' pre-code bulk sales laws was to protect against two forms of commercial fraud:
(a) The merchant, owing debts, who sells out his stock in trade to a friend for less than it is worth, pays his creditors less than he owes them, and hopes to come back into the business through the back door some time in the future.
(b) The merchant, owing debts, who sells out his stock in trade to any one for any price, pockets the proceeds, and disappears leaving his creditors unpaid.
[Uniform Commercial Code Comment 2 on N.J.S.A. 12A:6-101].
Enacted in New Jersey in 1961, the Code "represents a substantial improvement over existing law in its comprehensive treatment of the rights and duties of all parties and the clarity of its draftsmanship." Introductory commentary to New Jersey Uniform Commercial Code-Bulk Transfers Act, N.J.S.A. 12A:6-101 to -111. In order to effectuate such protection, N.J.S.A. 12A:6-104(1)(a) provides that a bulk transfer is ineffective against a "creditor" of the transferor unless the transferee requires the transferor to furnish a list "of his existing creditors" and § 104(2) requires that the list "contain the names and business addresses of all creditors of the transferor, with the amounts when known, and also the names of all persons who are known to the transferor to assert claims against him even though such claims are disputed." N.J.S.A. 12A:6-104(3) imposes responsibility for completeness and accuracy of the list upon the transferor only, unless the transferee "is shown to have had knowledge" of any errors or omissions. See also N.J.S.A. 12A:6-105 requiring notice of the date of transfer. Pursuant to N.J.S.A. 12A:6-106, the transferee is responsible for applying the proceeds of the sale to the creditors of the transferor. If the proceeds are not enough to pay all creditors, distribution must be made pro rata, except that secured creditors are entitled to priority. N.J.S.A. 12A:6-106(3). An ineffective transfer is voidable at the option of the creditor of the transferor. Sbar's Inc. v. N.J. Art & Craft Distributors, Inc., 205 N.J. Super. 516, 517-18, 501 A.2d 560 (App.Div. 1985) (remedy of the creditor is to execute upon the goods transferred or, if they are not in the *638 transferee's possession, to seek personal liability against the transferee to the extent of the value of the goods).
Plaintiff contends here that he was a creditor of Roth for the purposes of the protections afforded by the Act. N.J.S.A. 12A:6-109(1) defines creditors to encompass those persons "holding claims based on transactions or events occurring before the bulk transfer." An earlier A.L.I. draft of this section expansively encompassed claims "whether they arise from tort or contract, or are liquidated or unliquidated, or are secured or unsecured, or are contingent or fixed, or are presently due or not." See Uniform Commercial Code, § 7-711 (A.L.I. Draft, 1949). We take note of the New Jersey Study Comment No. 1 to N.J.S.A. 12A:6-109 which says the adopted definition does not "seem to limit in any way the definition of the earlier draft" and the Uniform Commercial Code Comment to this section that "[t]he claims referred to of course include unliquidated claims." We do not express the same confidence.
It is accepted that only persons with claims at the time of the sale or transfer are included, and not persons who extend credit or whose claims come into existence after the sale or transfer. And generally, persons having liquidated claims at the time of sale or transfer are creditors entitled to protection even though their claims may not be due or payable at the time of sale. See e.g., Waterman v. Perrotta, 144 Colo. 117, 119, 355 P.2d 313, 315 (1960) (holder of a promissory note for loan made before transfer was a creditor even though debt was not then due); accord Himmelstein v. Bach, 261 A.D. 57, 24 N.Y.S.2d 696 (1941) (pre-code case distinguishing claim on a note, though payment not due at time of transfer, from contingent liability, observing that the note obligation was fixed and determined in all respects as of the date of transfer). Further, the fact that a claim may not, as of the date of transfer, have been reduced to judgment, does not preclude bulk sales laws protection. Thus, N.J.S.A. 12A:6-104(2) requires the transferor to include in the list of creditors persons known to assert a claim even though the claim may be disputed. *639 See Royal Indem. Co. v. Ginsberg, 157 Misc. 507, 284 N.Y.S. 551 (N.Y.Mun.Ct. 1935) (insurer with a claim for earned premiums not reduced to judgment before transfer, nonetheless a creditor entitled to pre-code bulk transfer law protection under New York law). But see Jay v. United Defense Industries, Inc., 162 Ill. App.3d 1071, 1078, 114 Ill.Dec. 279, 284, 516 N.E.2d 434, 439 (1987) (under Arizona Bulk Transfer Act, plaintiff who had a tort claim against the transferor prior to the transfer, but before filing suit and obtaining judgment, was not a creditor entitled to protection under the Act).
There is, however, little consistent treatment of what are characterized as unliquidated or contingent claims. On the one hand, the United States District Court of New York, applying New York law, has held that creditors within the meaning of the uniform code bulk transfer act include anyone having a legal right to damages growing out of contract or tort, whether liquidated or unliquidated, contingent or fixed, due or not, or secured or unsecured. Chemical Bank v. Society Brand Industries, Inc., 624 F. Supp. 979, 981 (S.D.N.Y. 1985) (bank which had asserted a tort claim for conversion arising from a security interest in transferor's assets prior to transfer was a creditor entitled to protection of the act); see Alderman & Dole, 2 A Transactional Guide to the Uniform Commercial Code, § 5.30-10, p. 784 (1983) ("the term `creditor' includes all creditors who have claims in tort or in contract, liquidated or unliquidated, secured or unsecured, contingent or fixed, matured or unmatured."). Accord Stone's Pharmacy, Inc. v. Pharmacy Accounting Management, Inc., 812 F.2d 1063, 1065-66 (8th Cir.1987), cert. denied sub nom., Foxmeyer Corp. v. Stone's Pharmacy, Inc., 493 U.S. 1043, 110 S.Ct. 837, 107 L.Ed.2d 832 (1990) citing Fischer v. Rio Tire Co., 65 S.W.2d 751, 756 (Tex.Com.App. 1933) (dictionary definition of creditor is one who has a right to require fulfillment of an obligation or contract; term is not restricted to any particular class of creditors, but includes all persons who were creditors of the seller at the time of the sale, although their claims had not been reduced to judgment, or were not due, and although they were not creditors for merchandise *640 but merely general creditors of the seller in other transactions).
On the other hand, the United States District Court of Pennsylvania, applying Pennsylvania law, has concluded that creditor within the meaning of the uniform code bulk transfer act "refers to persons holding liquidated claims rather than to assertions of potential liability for breach of contract." Aluminum Shapes, Inc. v. K-A-Liquidating Co., 290 F. Supp. 356, 358 (W.D.Pa. 1968) (plaintiff contracted with transferor to supply all of its aluminum extrusion materials for a year, transferor attempted to cancel contract during term of the contract as a result of which plaintiff filed breach of contract suit; although transfer occurred without notice to seller and at a time transferor was aware of the claim, but just prior to filing of the suit, seller was not a creditor within the meaning of the code). Accord King v. Adams Toyota Inc., 722 F. Supp. 1379, 1380 (M.D.La. 1989) (Code applies only to liquidated claims and thus plaintiff who had a potential claim for medical expenses against transferor prior to transfer but not yet "certain what and how much is due," was not a creditor within the meaning of the code). Cf. Brown v. Superior Pontiac-GMC, Inc., 352 So.2d 576, 577 (Fla. Dist. Ct. App. 1977) ("[t]he obvious purpose of the bulk transfer statutes is to protect ordinary trade creditors who have a right to expect that their bills will be paid from the assets of an ongoing business. Though the applicable definition of creditor is broad, we do not believe that the legislature intended to include a dissenting stockholder within the protection afforded by bulk transfer statutes."). See e.g. pre-code cases, Griffin v. Allis-Chalmers Mfg. Co., 65 N.D. 379, 259 N.W. 89 (1934) (prior to transfer plaintiff purchased defective tractor from transferor who at the time of transfer had not repaired it, however plaintiff's claim for breach of contract had not yet been filed or adjudicated and thus the claim was viewed as of the date of transfer as unliquidated and contingent and plaintiff was found not to be a creditor entitled to the protection of the pre-code act); accord Hart v. Evans, 330 Ill. App. 385, 71 N.E.2d 546 (1947) (plaintiff's action for fraudulent misrepresentation in connection with sale of *641 a tractor was pending at time of transfer, but judgment thereon not obtained until after  claim was viewed as unliquidated, uncertain and continent and thus plaintiff not a creditor under the pre-code act). See generally, Annotation, Character or Class of Creditors Within the Contemplation of the Bulk Sales Law, 85 A.L.R.2d 1211 (1962), §§ 3-8; Annotation, Character or Class of Creditors Within Contemplation of Bulk Sales Law, 84 A.L.R. 1406, §§ II-V. See also Annotation, Bulk Transfers: Construction and Effect of UCC Article 6, Dealing With Transfer in Bulk, 47 A.L.R.3d 1114 § 6 (1973).
We focus here upon plaintiff's claim for rental obligations under the lease subsequent to termination.[2] Both code and pre-code cases dealing with whether a landlord is a creditor within the meaning of bulk sales acts for such a claim are few and not in accord. In each case, the particular result is based upon how the claim for future rents is characterized and, in some instances, based upon an expansive view of the type of creditors covered by the act.
In B & H Auto Supply Inc., v. Andrews, 417 S.W.2d 341 (Tex.Ct.Civ.App. 1967), for example, B & H was a tenant of Andrews-Dillingham Properties Inc. on a long term lease. With several years still remaining on the lease, B & H transferred all of its assets to a third party. The lease was paid as of the date of *642 the transfer, but was not assumed by the transferee. No further rental payments were made and the landlord was not notified of the transfer. The court concluded that the landlord was a creditor within the meaning of the Texas bulk sales act for the unpaid rents and thus entitled to its protections. In doing so, the court rejected B & H's claim that the unpaid rental payments were "contingent, not fixed and certain," and did so relying upon the general notion that a person holding a fixed but unmatured debt, such as a noteholder, is a creditor within the meaning of the act.
In considering a person with a claim for future rent similar to a noteholder, the court in B & H relied upon Ratliff v. Davis, 133 Colo. 315, 294 P.2d 1109 (1956), where lessors were considered creditors for future rents. But there, the particular lease at issue created at its commencement a lien upon the property for the full amount of the entire rent. The court in Ratliff characterized this lien as creating a contractual relationship that was "something more than that of landlord  tenant[.]" 133 Colo. at 318, 294 P.2d at 1110-1111. Accord Wright v. Haley, 208 Ind. 46, 49, 194 N.E. 637, 638 (1935) ("[t]he lessee's obligation to pay the installments for the full term is no different than the obligation to pay partial payments for merchandise delivered, and accepted, and in possession. It is no different than the obligation to pay for merchandise sold, to be paid for at a future date, which has not arrived, or to pay a promissory note given for merchandise, or for money, which has not matured."). Cf. McDowell v. Chambers, 525 So.2d 343 (La. Ct. App. 1988) (lessor was a creditor entitled to protection of bulk transfer act for an amount that included rents due after transfer based upon a characterization of rents as fixed and owing as of date of transfer because rent had not been paid for several months prior thereto  thus "[t]he lessor at that time [time of transfer] was a creditor...." 525 So.2d at 347); Empire Radio Co. v. Bates, 56 R.I. 116, 183 A. 882 (1936) (lessor on a long term lease and who was not notified of transfer of all of tenants assets on February 1, 1932, was creditor for purposes of the February 1932 rent where the lease provided that monthly rents were due *643 on the first day of the month, and, thus, claim for such rent had accrued as of that day).
On the other hand, in Trust Co. of Chicago v. Fargeson, 340 Ill. App. 344, 92 N.E.2d 211 (1950), the Illinois Court held that a lessor under a lease which provided for fixed gross rent payable in monthly installments, was not a creditor within the meaning of the Illinois pre-code bulk sales act for installments of rent not due at the time of sale of the lessee's assets. There, the lease period was from August 1947 to July 31, 1949 with a total sum of rent payable in monthly installments. On February 16, 1948, the lessor sold his entire business. As of that date, the rent was current. The assets were removed from the premises two days after the sale. The assets were thereafter resold and the lessor sought resort to the proceeds for all rents due after date of sale. Drawing upon an analysis of the historical basis for bulk sales acts, as well as how future rent is considered in other areas, the Illinois court concluded the lessor was not a creditor within the meaning of the bulk sales act for future rent claims. For instance, although noting that the Bankruptcy Act had subsequently been amended to permit a lessor to establish a claim for future rent up to one year, see 11 U.S.C. § 101, (4)(A); 11 U.S.C. § 502(b),[3] the court considered the following description of future rent in the context of a bankruptcy proceeding:
A contract of lease is peculiar in its nature, and differs in many respects from other contracts. Rent, as such, is an incident to, and grows out of, the use and occupancy, and is the consideration therefor. Unaccrued rent cannot be said, therefore, to be a fixed liability then absolutely owing, payable in the future, or, indeed, a `debt' of any kind, as that word seems to be used in the act. It is only an unmatured obligation to pay in the future a consideration for future enjoyment and *644 occupancy. This cannot be said to be, properly speaking, a present debt, demand, or claim at all, as these words are apparently used in the foregoing provisions, due regard being had to the context, and cannot come within either the clause as to fixed liability then owing or a debt founded on contract.
[Trust Co., 340 Ill. App. at 349, 92 N.E.2d at 214 (quoting In re Arnstein et al., 101 F. 706, 707 (S.D.N.Y. 1899))].
The court also noted that under general landlord and tenant law in Illinois, a covenant to pay rent does not create a debt until the date stipulated for payment. 340 Ill. App. at 349, 92 N.E.2d at 214. And in distinguishing the landlord's reliance upon Wright v. Haley, supra, and the landlord's reliance upon cases concerning claims based upon promissory notes not yet due, the court said:
The authorities on which plaintiff relies rest on the reasoning that as by precedent, a note payable in the future, or goods sold on installments are within the Bulk Sales Act, therefore, a lease providing for a gross amount of rental payable in future installments is likewise within that act. But, as we have pointed out, rent is in a different class, both historically and in any classification made with a realistic regard for the objectives and purposes of the Act. In a recent book, "An Introduction to Legal Reasoning," by Professor Edward H. Levi (University of Chicago Press, 1949), the fallacies and constructive values of reasoning by precedent are brilliantly revealed and illustrated. He says: "The problem for the law [in applying precedent] is: When will it be just to treat different cases as though they were the same? A working legal system must * * * be willing to pick out key similarities and to reason from them to the justice of applying a common classification." With what group of precedents shall we identify claims for future rent? It is true that in its provisions for payment, this lease is similar to any money obligation payable in installments. However, the vital difference to be considered in the interpretation of the Bulk Sales Act is that whereas a merchant creditor parts with his goods and a money creditor parts with his money, a lessor does not, in any comparable sense, part with his property. Moreover, the lessor is by statute given preferential and speedy remedies to repossess and obtain payment. The injustice of applying an interpretation which would include lessors has been pointed out in the cases cited. In the instant case, for example, to interpret the Act to include the lessor would be to give it a claim for rent which would continue for a period of more than a year following the sale. Business leases frequently run five, ten and twenty years. No creditors could be paid until some adjustment had been made of lessors' claims. The extent to which the operation of this Act could be seriously hampered by the inclusion of such claims is obvious.
[340 Ill. App. at 351-352, 92 N.E.2d at 215 (emphasis added)].
Cf. Apex Leasing Co. v. Litke, 173 A.D. 323, 159 N.Y.S. 707, 709 *645 (1916), aff'd, 225 N.Y. 625, 121 N.E. 853 (1918).[4]See also Modern Truck Renting Service Corp. v. Admiration Coat, Apron & Towel Supply Co. Inc., 107 N.Y.S.2d 253 (1951), aff'd 279 A.D. 754, 109 N.Y.S.2d 180 (1951) (long term lease on trucks not breached by lessee until after sale of its business and thus as of date of sale lessor was not a creditor under pre-code bulk sales law as to such rents).
Although there are no cases in New Jersey directly on point, we think Silco Automatic Vending Co., Inc. v. Howells, 105 N.J. Super. 511, 253 A.2d 480 (App.Div. 1969), reflects a view of claims for future rents more in line with Trust Co., supra. There, plaintiff had entered into an exclusive long term lease with defendant Al's Cozy for the leasing of space by Al's in its tavern for plaintiff's machines. The lease provided monthly rental payments. Al's sold the business to a third party who required removal of the machines. Plaintiff's contention that it was creditor under the bulk transfer act for its breach of contract claim was rejected by trial court primarily on the basis that the sale of the tavern business was not a bulk sale within the meaning of the act. In affirming that ruling, we also observed that plaintiff's claims for lost rent as a result of failure of the purchaser to assume the lease and provide space for the machines, was a claim based upon "events occurring after the transfer" and thus plaintiff was not a creditor within the meaning of the act. 105 N.J. Super. at 513, 253 A.2d 480. Here, the landlord's claim for lost future rent as a result of Novtex' failure to assume the lease and removal of the assets from the premises, can be similarly characterized as a claim based upon events that occurred after the sale.
*646 Furthermore, in considering what type of claims were contemplated by the Legislature to entitle a "creditor" to protection, we note the act requires the seller to prepare a list of creditors "with the amounts when known" and the names of persons known to assert claims even though they may be disputed. But, contrariwise, the broad definition originally proposed, which would have included contingent or potential claims, was rejected. In this respect, the Legislature knows how to define "creditors" expansively. See N.J.S.A. 25:2-21 (for the purposes of the Uniform Fraudulent Conveyance Act, creditor is a person having any claim defined as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured.").
We are inclined to agree with the view that a claim for future rents is beyond the scope of the bulk transfer act. The rationale expressed in Trust Co., albeit of some age, is, nonetheless, still entitled to considerable weight and is a rationale that has not been expressly altered by the definition of creditors under the U.C.C. Under that definition, to be a creditor one must have a "claim" as of the date of transfer. While the U.C.C. expressly includes "disputed" claims and thus clearly rejects those cases that suggest the need for a claim to be fixed and/or reduced to judgment, there is no indication the intent was to jettison the preexisting view that persons having claims that are contingent and become concrete upon the happening of subsequent events or circumstances, are not creditors within the meaning of the protections afforded the various bulk transfer acts. And we think Silco reflects a similar view.
Finally, we observe that New Jersey courts have consistently considered future rents as a contingent liabilities. Bloch v. Bell Furniture Co., 111 N.J. Eq. 551, 557, 162 A. 414 (E. & A. 1932). See Van Straaten & Havey, Inc. v. Foremost Silk Hosiery Mills, Inc., 126 N.J. Eq. 518, 520, 10 A.2d 292 (N.J.Ch. 1940), aff'd, 127 N.J. Eq. 53, 11 A.2d 233 (E. & A. 1940) (describing future rent as *647 contingent liability and disallowing claim for future rent in corporate insolvency proceeding because, in case of termination of tenancy, the landlord may lease the premises to someone else and thereby decrease or destroy the liability), and Finger v. Kemp, 112 N.J. Eq. 14, 16, 163 A. 153 (N.J.Ch. 1932) (dismissing landlord's complaint to set aside his tenant's conveyances: partnership was solvent at time of transfer, rent was not past due, and the liability under the lease was contingent; remoteness of debt made it difficult to infer a motive to defraud creditors). Cf. Hartwell v. Hartwell Co., Inc., 167 N.J. Super. 91, 96-97, 400 A.2d 529 (Ch.Div. 1979).
Even assuming plaintiff is a creditor entitled to the protection of the bulk transfer act, Novtex paid out the entire proceeds of the sale to other persons and companies who indisputably were "creditors" of Roth. It did under circumstances which indicate that the precise amounts of the claims were verified and the amounts paid were in good faith. Additionally, as evidenced by the jury verdict, Novtex had advised plaintiff several months prior to the sale that it was not assuming the lease and that it would remove Roth's assets by no later than the end of February. Other than the promise to ensure that the November and December rents would be brought current, plaintiff plainly was on notice that no further rents would be forthcoming. Not once is there any indication that prior to the sale any of the parties, including plaintiff, even contemplated the plaintiff could be a creditor within the meaning of the act for the purposes of its protections.
N.J.S.A. 12A:6-109(2) provides:
Against the aggregate obligation imposed by the provisions of this Chapter concerning the application of the proceeds (12A:6-106 and subsection (3)(c) of 6-108) the transferee or auctioneer is entitled to credit for sums paid to particular creditors of the transferor, not exceeding the sums believed in good faith at the time of the payment to be properly payable to such creditors.
On its face, this section gives to Novtex a dollar for dollar credit of all amounts paid to other creditors "not exceeding the sums believed in good faith" to be due. Although plaintiff argues that this credit protects a transferee who pays out proceeds of a sale *648 only against a claim by another creditor that the particular amount paid was more than it should have been, there is nothing in the language of the statute to support such a restrictive interpretation and counsel cites to us no supporting cases. Moreover, we have previously stated to the contrary. Sbars, Inc. v. N.J. Art & Craft Distributors, 205 N.J. Super. 516, 518, 501 A.2d 560 (App.Div. 1985) ("[d]efendant [bulk sales purchaser] is to be credited with all payments heretofore made to creditors...."). Although we so held there in the context of payments made through the bankruptcy court, the statute does not limit the credit based upon who makes the payments or where the payments are made, but rather focuses upon to whom the payments are made and the good faith thereof. See also Hawkland, Uniform Commercial Codes Services, § 6-109:02, p. 129-130; Anderson, 7 Uniform Commercial Code, (3d ed. 1985), U.C.C. § 6-109, p. 438.[5]

II.
We next deal with plaintiff's appeal from the reduction of his rentor's lien pursuant to N.J.S.A. 2A:44-165 by the amount of the security deposit and Novtex's cross-appeal from any judgment entered under the statute. It is undisputed that as of the date of removal of Roth's equipment from the premises, the amount of unpaid rent and other charges was $10,622.00. Novtex claims, however, that the act does not impose liability upon a subsequent purchaser, but that the sole remedy a landlord possesses is sale of the tenant's property.
N.J.S.A. 2A:44-166 provides:

*649 A rentor shall be entitled to a lien on machinery and other chattels to the extent of the rentee's interest therein for the amount of unpaid rent, from the date the rent is unpaid.
Such lien hereby created shall have priority and be paramount to any title, lien, interest, mortgage, judgment or other encumbrance created or acquired after machinery or other chattels are placed in the premises. Such priority shall extend only to the amount of unpaid rent for not more than 6 months.
N.J.S.A. 2A:144-167 authorizes the rentor to sell the machinery or other chattels at public auction. It does not, however, require such sale or any other action be taken by the landlord to perfect the lien; rather, the lien is inchoate and attaches from the date the rent becomes due and remains unpaid. In re Holly Knitwear, Inc., 140 N.J. Super. 375, 382, 356 A.2d 405 (App.Div. 1976). Indeed "[i]t is not actually a lien at all, but rather a statutory right to preference in payment over other creditors." Hartwell v. Hartwell Co., Inc., 167 N.J. Super. 91, 97, 400 A.2d 529 (Ch.Div. 1979).
We reject Novtex's argument that responsibility for the lien cannot be imposed upon it. The statute expressly impresses the lien upon the tenant's property "from the date the rent is unpaid" and "paramount to any title ... interest created or acquired...." Here, at the date of the transfer, it is undisputed Roth owed plaintiff $10,622.00. As of that date, its assets were impressed with a lien equal to that amount and Novtex took those assets subject to that lien. See Blanos v. Eastwood Realty Co., 116 N.J.L. 1, 3-4, 181 A. 144 (E. & A. 1935) (sheriff's sale purchase of tenant's equipment subject to landlord's statutory lien).
Moreover, we agree with plaintiff that the trial court should not have deducted the security deposit from the amount of the lien. Pursuant to the lease, plaintiff "may use, apply or retain the whole or any part of the security" to either cure a default or reimburse for damages or expenses incurred as a result of the default, including expenses incurred in reletting. Here, it is uncontroverted that plaintiff applied the deposit against costs incurred to repair Roth's space and prepare it for the new tenant. It could not, thus, be credited a second time against plaintiff's lien.

*650 III.

Plaintiff's final claim is that the jury charge on damages was erroneous thus requiring a new trial. The jury did not reach the issue of damages, having rejected plaintiff's claim of fraudulent misrepresentation. Any error in the charge on damages is moot.

IV.
We, thus, affirm the dismissal of the bulk transfer act claim and the dismissal of the fraudulent misrepresentation claim. We modify the judgment pursuant to the Rentor's Lien Act to impose a lien in the amount of $10,622.00 upon Novtex and, as modified, affirm that judgment. We remand for the entry of an amended judgment consistent with this opinion.
NOTES
[1] The fraud counts were tried by a jury. The parties agreed to a nonjury disposition of the bulk transfer act and rentor's lien counts.
[2] As of the date of transfer Roth owed plaintiff $10,622 (January's rent, late fees for December and maintenance charges) and could be considered a creditor entitled to a judgment against Novtex under the Bulk Sales Act for that amount. Our modification, however, of the judgment entered pursuant to the rentor's lien act, gives plaintiff a judgment against Novtex for that amount and thus renders moot the application of the Act vis-a-vis the then due rent and other charges. Although plaintiff contends that had he received notice he would have considered Roth in anticipatory breach of the lease triggering the acceleration clause rendering future rents due as of the date of transfer, (cf. Seitz v. Mark-O-Lite Sign Contractors, Inc., 210 N.J. Super. 646, 654, 510 A.2d 319 (App.Div. 1986)), we view that claim as too speculative, particularly given the fact that plaintiff did not exercise the acceleration clause at any time during October, November and January when he was plainly aware of Roth's financial difficulties and plans to terminate the lease.
[3] See Oldden v. Tonto Realty Corp., 143 F.2d 916, 918-920 (2nd Cir.1944) discussing the rationale under prior bankruptcy law for treating landlords differently from other creditors ("[i]n truth, the landlord is not in the same position as other general creditors, and there is no very compelling reason why he should be treated on a par with them. For, after all, he has been compensated up until the date of the bankruptcy petition, he regains his original assets upon bankruptcy, and the unexpired term in no way really benefits the assets of the bankrupt's estate." 143 F.2d at 920).
[4] In Apex, under pre-code bulk sales law the claim for future rents was viewed as a "contingent" claim not entitled to protection under the N.Y. Bulk Sales Act. This view of contingent liabilities as not entitled to protection was distinguished in Chemical Bank v. Society Brand Industries, Inc., supra, 624 F. Supp. at 981, on the basis that the Uniform Commercial Code was intended to broaden the category of creditors to include such liabilities, a view we are not entirely in accord with.
[5] As a result of this conclusion, we need not address Novtex's alternative contention that the transfer is exempt from the act pursuant to N.J.S.A. 12A:6-103(3) as a transfer "in settlement or realization of a lien or other security interest." Were we to reach the issue, we would be inclined to reject it since only a portion of the proceeds from the transfer were for the satisfaction of "a lien or other security interest." See Starman v. John Wolfe, Inc., 490 S.W.2d 377, 382-83 (Mo. Ct. App. 1973); River Cty. Prods. Inc. v. AEJ, Inc., 774 S.W.2d 452, 454 (Ky. Ct. App. 1989).