**ED PETERS JEWELRY CO., INC., Plaintiff, Appellant,**

v.

**C & J JEWELRY CO., INC., ET AL., Defendants, Appellees.**

No. 96–1642.

United States Court of Appeals, First Circuit.

Heard May 6, 1997.

Decided Aug. 29, 1997.

Robert Corrente, Providence, RI, with whom Corrente, Brill & Kusinitz, Ltd., Sanford J. Davis, Guttenberg, NJ, and McGovern & Associates were on brief, for appellant.

John A. Houlihan, with whom Edwards & Angell and Marc A. Crisafulli were on brief, for appellees Fleet National Bank and Fleet Credit Corp.

James J. McGair, Providence, RI, with whom McGair & McGair was on brief, for appellees C & J Jewelry Co., Inc. and William Considine, Sr.

Before TORRUELLA, Chief Judge, ALDRICH, Senior Circuit Judge, and CYR, Circuit Judge.

CYR, Circuit Judge.

Plaintiff Ed Peters Jewelry Co., Inc. ("Peters") challenges a district court judgment entered as a matter of law pursuant to Fed. R.Civ.P. 50(a) in favor of defendants-appellees on Peters' complaint to recover $859,068 in sales commissions from Anson, Inc. ("Anson"), a defunct jewelry manufacturer, its chief executive officer (CEO) William Considine, Sr. ("Considine"), its secured creditors Fleet National Bank and Fleet Credit Corporation (collectively: "Fleet"), and C & J Jewelry Company ("C & J"), a corporate entity formed to acquire Anson's operating assets.

We affirm the district court judgment in part, and vacate and remand in part.

## I

## BACKGROUND [1]

We restrict our opening factual recitation to an overview, reserving further detail for discussion in connection with discrete issues. Anson, a Rhode Island jewelry manufacturer, emerged from a chapter 11 reorganization proceeding in 1983. Thereafter, Fleet routinely extended it revolving credit, secured by blanket liens on Anson's real property and operating assets.

In January 1988, Anson executed a four-year contract designating Peters, a New York corporation, as one of its sales agents. Peters serviced Tiffany's, an account which represented roughly one third of all Anson sales. By the following year, however, Anson had fallen behind in its commission payments to Peters. During 1991, in response to Anson's dire financial straits and the adverse business conditions prevailing in the domestic jewelry industry at large, Fleet restructured Anson's loan repayment schedule and assessed Anson an $800,000 deferral fee. In 1992, after determining that Anson had not achieved the pre-tax, pre-expense earnings level specified in the 1991 loan restructuring agreement, Fleet waived the default and loaned Anson additional monies, while expressly reserving its right to rely on any future default. Anson never regained solvency. See Fleet Credit Memo (10/14/93), at 6 ("[Anson] is ... technically insolvent, with a negative worth of $6MM at 12/31/92.").

Fleet and Anson entered into further loan restructuring negotiations in April 1993, after Fleet determined that Anson had not achieved the prescribed earnings target for December 1992. Fleet gave Anson formal written notice of the default.

During May 1993, Considine, Anson's CEO, submitted a radical "restructuring" proposal to Fleet, prompted by the fact that Anson owed numerous creditors, including Peters, whose claims represented a serious drain on its limited resources. Considine recommended that Fleet foreclose on Anson's assets, that Anson be dissolved, and that a new company be formed to acquire the Anson assets and carry on its business. The Considine recommendation stated: "If Fleet can find a way to foreclose [Anson] and sell certain assets to our [new] company that would eliminate most of the liabilities discussed above [viz., including the Peters debt], then we would offer Fleet ... $3,250,-000." The $3,250,000 offer to Fleet also contemplated, however, that the new company would assume all Anson liabilities to essential trade creditors. Otherwise, Fleet was to receive only $2,750,000 for the Anson assets following the Fleet foreclosure and Fleet would assume "all the liabilities and the problems attached to it and, hopefully, be able to work them out."

Fleet agreed, in principle, to proceed with the proposed foreclosure sale, noting reservations respecting only the foreclosure price and the recommendation by Considine that the debt due Peters neither be satisfied by Anson nor assumed by the new company. In the latter regard, Fleet advised that its "counsel [was] not convinced that you will be able to do this without inviting litigation," and that "there may be a problem on this issue."

In October 1993, Fleet gave Anson formal notice that its operating assets were to be sold in a private foreclosure sale to a newly-formed corporation: C & J Jewelry. Ostensibly out of concern that Tiffany's might learn of Anson's financial difficulties, and find another jewelry manufacturer, Fleet did not invite competing bids for the Anson operating assets.

Meanwhile, Peters had commenced arbitration proceedings against Anson, demanding payment of its unpaid sales commissions. Peters subsequently secured two arbitration awards against Anson for $859,068 in sales commissions. The awards were duly confirmed by the Rhode Island courts.

On October 22, 1993, Anson ceased to function; C & J acquired its operating assets in a private foreclosure sale from Fleet and

---

1. The facts are related in the light most favorable to appellant Peters, the nonmoving party. See Fed.R.Civ.P. 50(a); *Coyante v. Puerto Rico Ports Auth.*, 105 F.3d 17, 21 (1st Cir.1997).

thereupon continued the business operations without interruption. After the fact, Anson notified Peters that all Anson operating assets had been sold to C & J at foreclosure, by Fleet.

C & J was owned equally by the Considine Family Trust and Gary Jacobsen. Considine, Gary Jacobsen and Wayne Elliot, all former Anson managers, became the joint C & J management team. Jacobsen and Considine acquired the Anson operating assets from Fleet for approximately $500,000 and Fleet immediately deposited $300,000 of that sum directly into various accounts which had been established at Fleet in the name of C & J. The $300,000 deposit was to be devoted to capital expenditures by C & J. Fleet itself financed the remainder of the purchase price (approximately $1.4 million), took a security interest in all C & J operating assets, and received $500,000 in C & J stock warrants scheduled to mature in 1998. C & J agreed to indemnify Fleet in the event it were held liable to any Anson creditor. *See* Credit Agreement ¶ 8.10. Considine received a $200,000 consulting fee for negotiating the sale.

In December 1993, Fleet sold the Anson real estate for $1.75 million to Little Bay Realty, another new company incorporated by Considine and Jacobsen. Considine and Jacobsen settled upon the dual-company format in order to protect their real estate investment in the event C & J itself were to fail. The two principals provided an additional $500,000 in capital, half of which was used to enable Little Bay Realty to acquire the Anson real estate from Fleet. The remainder was deposited in a Little Bay Realty account with Fleet, to be used for debt service. Fleet in turn advanced the $1.5 million balance due on the purchase price. Little Bay leased the former Anson business premises to C & J.

In April 1994, Peters instituted the present action in federal district court, alleging that Anson, C & J (as Anson's "successor"), Considine, and Fleet had violated Rhode Island statutory law governing bulk transfers and fraudulent conveyances, and asserting common law claims for tortious interference with contractual relations, breach of fiduciary duty, wrongful foreclosure, and "successor liability." The complaint essentially alleged that all defendants had conspired to conduct a sham foreclosure and sale for the purpose of eliminating Anson's liabilities to certain unsecured creditors, including the $859,068 debt due Peters in sales commissions.

The defendants submitted a motion *in limine* to preclude the testimony of two witnesses—former banker Richard Clarke and certified public accountant John Mathias—who were to have provided expert testimony on the value of the Anson assets. Ultimately, their testimony was excluded by the district court on the grounds that their valuation methodologies did not meet minimum standards of reliability and, therefore, their testimony would not have aided the jury.

Finally, after Peters rested its case in chief, the district court granted judgment as a matter of law for all defendants on all claims. The court essentially concluded that neither Peters nor other Anson unsecured creditors had been wronged by the private foreclosure sale, since Fleet had a legal right to foreclose on the encumbered Anson assets which were worth far less than the amount owed Fleet.

## II

## DISCUSSION

### A. Exclusion of Expert Testimony

Many of the substantive claims asserted by Peters depend largely upon whether Fleet was an *oversecured* creditor, *i.e.*, whether the Anson assets were worth more than the total indebtedness Anson owed Fleet as of the October 1993 foreclosure. Otherwise, since Fleet had a legal right to foreclose on all the Anson assets, there could have been no surplus from which any Anson unsecured or judgment creditor, including Peters, could have recovered anything. Thus, evidence on the value of the Anson assets at the time of the Fleet foreclosure was critical.

Peters proffered the testimony of CPA John Mathias on the value of the Anson assets. During voir dire, Mathias testified that the total Anson indebtedness to Fleet amounted to $9,828,000, but that the total

value of its assets was $12,738,500.[2] The district court granted the motion *in limine* in all respects.

## 1. Standard of Review

 Peters tendered the Mathias testimony pursuant to Fed.R.Evid. 702,[3] which requires trial courts to assess expert-witness proffers under a three-part standard. *Bogosian v. Mercedes–Benz of N.A., Inc.*, 104 F.3d 472, 476 (1st Cir.1997). The trial court first must determine whether the putative expert is "qualified by 'knowledge, skill, experience, training, or education.'" *Id.* (citation omitted). Second, it inquires whether the proffered testimony concerns "'scientific, technical, or other specialized knowledge.'" *Id.* (citation omitted). Finally, it must perform its gatekeeping function, by assessing whether the testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* Thus, the trial court must decide whether the proposed testimony, including the *methodology* employed by the witness in arriving at the proffered opinion, "rests on a *reliable foundation* and is *relevant* to the facts of the case." *Id.* at

476, 479 (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597, 113 S.Ct. 2786, 2799, 125 L.Ed.2d 469 (1993)) (emphasis added); *Vadala v. Teledyne Indus., Inc.*, 44 F.3d 36, 39 (1st Cir.1995). Finally, the circumspect and deferential standard of review applicable to Rule 702 rulings contemplates their affirmance absent manifest trial-court error. *Bogosian*, 104 F.3d at 476 (noting that "an expert witness's usefulness is almost always a case-specific inquiry"); *see also United States v. Schneider*, 111 F.3d 197, 201 (1st Cir.1997) ("In [determining] ... relevance, ... reliability, helpfulness[,] the district court has a comparative advantage over an appeals panel ... [and] is closer to the case.").[4]

## 2. Total Anson Indebtedness

 The district court ruled that the proffered testimony from Mathias, fixing the total Anson indebtedness to Fleet at $9,828,-000, was patently flawed. For one thing, Mathias admitted not including the $800,000 deferral fee Anson owed Fleet in connection with the 1991 loan restructuring, *see supra*

2. A breakdown of the Mathias methodology follows:

| Asset | Maximum Value | Average Value | Minimum Value |
|---|---|---|---|
| Accounts Receivable | 1,500.000 | 1,500,000 | 1,500,000 |
| Other Sales (Unrecorded) | 418,000 | 409,000 | 400,000 |
| Other Sales (Backlog) | 400,000 | 400,000 | 400,000 |
| Inventory | 2,648,000 | 2,648,000 | 2,648,000 |
| Machinery/Equipment | 450,000 | 375,000 | 300,000 |
| Real Estate | 2,941,000 | 2,941,000 | 2,941,000 |
| Intangible assets | 2,714,000 | 1,998,500 | 1,283,000 |
| Net Operating Losses | 1,442,000 | 1,267,000 | 1,092,000 |
| Life Insurance Policy | 1,200,000 | 1,200,000 | 1,200,000 |
| Total (Avg) | | 12,738,500 | |
| (less) Fleet Debt | | (9,828,000) | |
| Amount Fleet Oversecured | | 2,910,500 | |

3. Evidence Rule 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Fed.R.Evid. 702.

4. The United States Supreme Court has granted certiorari in *Joiner v. General Elec. Co.*, 78 F.3d 524 (11th Cir.1996), *cert. granted*, —— U.S. ——, 117 S.Ct. 1243, 137 L.Ed.2d 325 (1997), wherein the Eleventh Circuit held that *Daubert* requires appellate courts to employ a more stringent stan-

dard than "abuse of discretion" in reviewing trial court "gatekeeping" rulings at the summary judgment or directed judgment stage. *See Cortes–Irizarry v. Corporacion Insular De Seguros*, 111 F.3d 184, 189 n. 4 (1st Cir.1997); *compare Joiner*, 78 F.3d at 529, *and In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 749–50 (3d Cir.1994) (same), *with Duffee v. Murray Ohio Mfg. Co.*, 91 F.3d 1410–11, 1411 (10th Cir.1996) (*Daubert* requires customary abuse-of-discretion review), *and Buckner v. Sam's Club, Inc.*, 75 F.3d 290, 292 (7th Cir.1996) (same). As the district court ruling was proper under either standard, we need not opt between them.

Section I, even though he did not question its validity. Moreover, Mathias conceded that he had no independent knowledge regarding the total Anson indebtedness, but compiled the $9,828,000 figure from unspecified Fleet documents. Thus, Peters adduced no competent evidence that the total Anson indebtedness was less than $10,628,000.

### 3. *Value of the Fleet Security Interest*

■ The district court ruled, for good reason, that the methodology Mathias used to arrive at the $12,738,500 total valuation for the Anson assets was internally inconsistent and unreliable. First, on deposition in February 1996 Mathias had valued the Anson assets at only $10,238,000, roughly equal to the total indebtedness Anson owed Fleet. After Fleet moved for summary judgment, however, Mathias revised the valuation on Anson's assets upward by approximately $2.5 million—well above the total Fleet indebtedness. Thus, the "moving target" nature of the valuation alone provided ample reason for the district court to scrutinize the Mathias methodology with special skepticism. Against this backdrop, therefore, the deferential standard of review looms as a very high hurdle for Peters. We turn now to the principal factors which accounted for the increased valuation.

### a. *Net Operating Losses*

Mathias valued Anson's $5 million net operating loss ("NOL") at approximately $1,267,000. Of course, an NOL "carryforward" may have potential value to the taxpayer (*viz.*, Anson) if it can be used to offset future taxable income.[5] Mathias conceded, however, that his inclusion of the NOL carryforward as an Anson asset was "inconsistent," since an NOL normally cannot be transferred, with certain exceptions inapplicable here (*e.g.*, a change in the ownership of a corporate taxpayer through qualified stock acquisitions). Thus, the Anson NOL carryforward would have been valueless to a third-party *purchaser* at foreclosure.

Mathias, on the other hand, included the $1,267,000 NOL in tallying Anson assets on the theory that the Fleet foreclosure extinguished Anson's future right to utilize the NOL, thereby effectively "destroying" the asset. The Mathias thesis is beside the point, however, since the appraisal was designed to determine the value of Fleet's *security interest* in Anson's assets at the date of foreclosure (*i.e.*, the value Fleet might reasonably expect to realize were the assets sold and applied to the Anson debt), *not* the value of the NOL while Anson continued to function as a going concern. Thus, Mathias effectively conceded that the value of the Fleet security interest in the NOL was *zero*.

### b. *Keyman Life Insurance Policy*

Mathias proposed to testify that the keyman insurance policy Anson owned on the life of a former director was worth $1.2 million. The valuation was derived from a Fleet document assessing Fleet's collateral position, in which the $1.2 million figure reflected the *net proceeds* payable to the beneficiary (*i.e.*, Fleet) at the death of the insured.[6]

The district court correctly concluded that the Mathias appraisal was patently inflated. As previously noted, the only material consideration, for present purposes, was the policy's value at the time Fleet *foreclosed in October 1993*, when the insured had a life expectancy of seven years and the cash value was only $62,000. At the very most, therefore, an arm's-length purchaser would have paid an amount equal to $1.2 million, *discounted to present value*.

Indeed, pressed by the district court, Mathias conceded that he had not calculated "present value," but then estimated it at "somewhere in the vicinity of $800,000." Mathias likewise conceded that he had not taken into account the annual premium ($75,000) costs for maintaining the policy seven more years, totaling $525,000. Thus, Mathias effectively conceded that the policy might fetch only $275,000, some $925,000 below the proffered valuation. Absent any suggestion

5. The Internal Revenue Code allows NOLs to be carried *back* 3 years, and forward 15 years. *See* 26 U.S.C. § 172(b).

6. Although its face value was $1.5 million, the policy had been pledged to Fleet to secure a $300,000 loan.

that accepted accounting principles would countenance such deficiencies, the district court acted well within its discretion in excluding the Mathias valuation.

As there has been no demonstration that the appraisal "rest[ed] on a reliable [methodological] foundation," *Bogosian*, 104 F.3d at 477, 479, with respect to the net operating losses and the keyman insurance policy, the most optimistic valuation to which Mathias supportably might have testified was $10,-271,500, *see supra* Section II.A.2—$356,500 less than the total Anson indebtedness to Fleet—even assuming all other property values ascribed by Mathias were reasonably reliable, such as intangible assets (*e.g.*, goodwill, trade reputation, going-concern value, etc.) totaling $1,998,500, *see* Rev. Rul. 68–609, 1968–2 C.B. 327; the $2,648,000 valuation given Anson's inventory; and the $2,941,000 real estate valuation.

### B. The Rule 50(a) Judgments on Substantive Claims

#### 1. Standard of Review

■ Judgments entered as a matter of law under Rule 50(a) are reviewed *de novo*, to determine whether the evidence, viewed most favorably to the nonmoving party, Peters, could support a rational jury verdict in its favor. *See* Fed.R.Civ.P. 50(a); *Coyante v. Puerto Rico Ports Auth.*, 105 F.3d 17, 21 (1st Cir.1997). Of course, Peters was not entitled to prevail against the Rule 50(a) motion absent competent evidence amounting to " 'more than a mere scintilla.' " *Id.* (citation omitted).

#### 2. The Peters Claims

The gravamen of the substantive claims for relief asserted by Peters is that Fleet colluded with Considine and Jacobsen to rid Anson of certain burdensome unsecured debt, there-

by effecting a partial "private bankruptcy" discharge under the guise of the Fleet foreclosure, which advantaged Considine and Jacobsen at the expense of Peters and other similarly situated Anson unsecured creditors. The Peters proffer included: (1) the March 1993 decision by Fleet to declare Anson in default, which coincided with the Peters demand for payment from Anson on its sales commissions; (2) the August 1992 decision by Fleet to waive a default involving a shortfall much larger than the March 1993 default; (3) the 1993 negotiations with Fleet, in which Considine and Jacobsen made known their intention that C & J not assume the unsecured debt Anson owed Peters; (4) the decision to arrange a private foreclosure sale by Fleet, thus ensuring that C & J alone could "bid" on the Anson operating assets; and (5) the payments made to select unsecured Anson creditors (*i.e.*, essential trade creditors) only.

The district court ruled that Peters' failure to establish that Anson's assets were worth more than its total indebtedness to Fleet was fatal to all claims for relief. It noted that, as an unsecured creditor of Anson, Peters was simply experiencing a fate common among unsecured creditors who lose out to a partially *secured* creditor (hereinafter: "undersecured creditor") which forecloses on their debtor's collateral. As the district court did not analyze the individual claims for relief, we now turn to that task.

#### a. Fraudulent Transfer Claims

■ Peters first contends that the jury reasonably could have found defendants' transfer of the Anson assets fraudulent under R.I. Gen. Laws §§ 6–16–1 *et seq.*, which provides that a "transfer" is fraudulent if made "[w]ith actual intent to hinder, delay, or defraud any creditor of the debtor." *Id.* § 6–16–4(a)(1).[7] Normally, it is a question of

---

7. The Rhode Island fraudulent transfer statute lists eleven "badges of fraud," from which a factfinder might infer actual fraudulent intent: "(1) The transfer or obligation was to an insider; (2) The debtor retained possession or control of the property transferred after the transfer; (3) The transfer or obligation was ... concealed; (4) Before the transfer was made or [the] obligation was incurred, the debtor had been sued or

threatened with suit; (5) The transfer was of *substantially all the debtor's assets*; (6) The debtor absconded; (7) The debtor removed or concealed assets; (8) The value of the consideration received by the debtor was [not] reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was

fact whether a transfer was made with actual intent to defraud. At least arguably, moreover, Peters adduced enough competent evidence to enable the jury to infer that defendants deliberately arranged a conveyance of the Anson assets with the specific intent to leave the Peters claim unsatisfied. Nonetheless, under the plain language of the Rhode Island statute, the actual intent of the defendants was immaterial as a matter of law.

The statute covers only a "[fraudulent] *transfer* made or obligation incurred by a debtor." *Id.* § 6–16–4(a) (emphasis added). The term "transfer" is defined as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an *asset or an interest in an asset,* and includes payment of money, release, lease, and creation of a lien or other encumbrance." *Id.* § 6–16–1(*l*). However, the term "asset" "does *not* include ... (1) Property *to the extent it is encumbered by a valid lien.*" *Id.* § 6–16–1(b) (emphasis added). As Fleet unquestionably held a valid security interest in all Anson assets, and Peters did not establish that their fair value exceeded the amount due Fleet under its security agreement, *see supra* Section II.A, the Anson property conveyed to C & J did not constitute an "asset" and no cognizable "transfer" occurred under section 6–16–4(a). *See also Richman v. Leiser,* 18 Mass.App.Ct. 308, 465 N.E.2d 796, 798 (1984) ("A conveyance is not established as a fraudulent conveyance upon a showing of a fraudulent intention alone; there must also be a resulting diminution in the assets of the debtor available to [unsecured] creditors.").

### b. *The Wrongful Foreclosure Claim and Uniform Commercial Code ("UCC") § 9–504*

█ Peters claimed that Fleet, in combination with the other defendants, conducted a "wrongful foreclosure" by utilizing its right of foreclosure as a subterfuge for effectuating Anson's fraudulent intention to avoid its lawful obligations to certain unsecured creditors. Thus, Peters contends, Fleet violated

its duty to act in "good faith," *see* R.I. Gen. Laws § 6A–1–203 ("Every contract or duty within title 6A imposes an obligation of good faith in its performance or enforcement."), thereby entitling Peters to tort damages. The "good faith" claim likewise fails.

As Peters adduced no competent evidence that Fleet concocted the March 1993 *default* by Anson, it demonstrated no trialworthy issue regarding whether Anson remained in default at the time the foreclosure took place in October 1993. Specifically, Peters proffered no competent evidence to counter the well-supported ground relied upon by Fleet in declaring a default under the 1991 loan restructuring agreement; namely, that Anson failed to meet its earnings target for 1992. *See supra* Section I. Nor is it material that Fleet had waived an earlier default by Peters in 1992, particularly since Fleet at the time expressly reserved its right to act on any future default. *See id.* Thus, Fleet's legal right to foreclose was essentially uncontroverted at trial.

The Peters argument therefore reduces to the proposition that a secured creditor, with an uncontested right to foreclose under the terms of a valid security agreement, nonetheless may be liable on a claim for wrongful foreclosure should a jury find that the secured creditor exercised its right based in part on a clandestine purpose unrelated to the default. *But see Richman,* 465 N.E.2d at 799 ("To be a 'collusive foreclosure,' a foreclosure must be based on a fraudulent mortgage, or it must be irregularly conducted so as to claim a greater portion of the mortgagor's property than necessary to satisfy the mortgage obligation.") (citations omitted). Since Peters cites—and we have found—no Rhode Island case articulating the exact contours of a wrongful foreclosure claim by an unsecured creditor under R.I. Gen. Laws § 6A–1–203, in the exercise of our diversity jurisdiction we are at liberty to predict the future course of Rhode Island law. *See Van-Haaren v. State Farm Mut. Auto. Ins. Co.,* 989 F.2d 1, 3 (1st Cir.1993). Nevertheless, having chosen the federal forum, Peters is

---

incurred; (10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor." R.I. Gen. Laws § 6–16–4(b).

not entitled to trailblazing initiatives under Rhode Island law. *See Carlton v. Worcester Ins. Co.,* 923 F.2d 1, 3 (1st Cir.1991); *Porter v. Nutter,* 913 F.2d 37, 40–41 (1st Cir.1990). Nor do its citations—none purporting to apply Rhode Island law—persuade us that the Rhode Island courts would countenance the freewheeling "wrongful foreclosure" claim it advocates.[8]

▆▆▆▆▆ Thus, the Peters contention that the jury would need to delve further into what motivated Fleet to exercise its legitimate contractual right to foreclose lacks significant foundation in the cited authorities. *See also, e.g., E.A. Miller, Inc. v. South Shore Bank,* 405 Mass. 95, 539 N.E.2d 519, 523 (1989) ("The [UCC] defines '[g]ood faith'

as 'honesty in fact in the conduct or transaction concerned[,]' [and][t]he essence of bad faith, in this context, is not the [secured creditor's] state of mind but rather the attendant bad actions.") (citations omitted). Consequently, Peters is left to its argument that the Fleet decision to conduct a private foreclosure sale, rather than solicit potential competing buyers at a public sale, rendered the foreclosure sale "commercially unreasonable," in violation of the *objective* "good faith" requirement established in R.I. Gen. Laws § 6A–1–203. *See, e.g., American Sav. & Loan Ass'n v. Musick,* 531 S.W.2d 581, 587 (Tex.1975) (wrongful foreclosure involves irregularities in sale which contributed to inadequate price).[9]

8. Tellingly, none of the cited cases involved a plaintiff who had prevailed without demonstrating actual prejudice; that is, that the secured creditor had neither a present contractual right to foreclose nor a comprehensive lien claim balance exceeding the value of the collateral.

We briefly note the more significant distinguishing features which make the cited authorities inapposite. First, in *Voest–Alpine Trading USA v. Vantage Steel Corp.,* 732 F.Supp. 1315, 1324–25 (E.D.Pa.1989), *aff'd,* 919 F.2d 206 (3d Cir.1990), a foreclosure and resale were set aside, *not as constituting a wrongful foreclosure under the common law,* but under the Pennsylvania Fraudulent Conveyance Act, *see* Pa. Stat. Ann. tit. 39, § 357 (repealed 1993). Moreover, whereas Peters failed to show that the Anson assets were even arguably worth more than the Anson indebtedness to Fleet, *see supra* Section II.A., in *Voest–Alpine,* 732 F.Supp. at 1322, 1325, where the collateral was worth *"at least* $1 million" and the $1.5 million secured indebtedness was backed by personal guarantees of $300,000 as well, the district court concluded that the plaintiff had been "prejudiced" because it might have received partial payment had the debtor been forced into a chapter 7 liquidation or chapter 11 reorganization.

Second, in *Limor Diamonds, Inc. v. D'Oro by Christopher Michael, Inc.,* 558 F.Supp. 709 (S.D.N.Y.1983), the plaintiff, who had sold the debtor diamonds without obtaining a perfected purchase money security interest, sued both the debtor and a secured creditor which had foreclosed on the debtor's entire inventory, including the diamonds, as after-acquired property subject to its perfected security interest. The plaintiff alleged a conspiracy to *convert* the diamonds, on the ground that the defendants had induced the plaintiff to *deliver* the diamonds even as the secured creditor was poised to foreclose on any after-acquired collateral. *Id.* at 711–12. Thus, the species of bad faith alleged in *Limor* was qualitatively different from any involved here, since Peters had supplied Anson with no goods

or assets which could have become subject to the Fleet security interest.

Third, in *Mechanics Nat'l Bank of Worcester v. Killeen,* 377 Mass. 100, 384 N.E.2d 1231 (1979), a "wrongful foreclosure" claim was upheld where *no default* had occurred. *Id.,* 384 N.E.2d at 1235–36. In the instant case, of course, there is no suggestion that Peters was not in default under its loan restructuring agreement with Fleet.

Finally, Peters relies on *Sheffield Progressive, Inc. v. Kingston Tool Co.,* 10 Mass.App.Ct. 47, 405 N.E.2d 985 (1980), which upheld a denial of a motion to dismiss a "collusive foreclosure" claim that collateral worth over $3 million had been sold in a private foreclosure sale for only $879,159, the *full* amount of the secured debt. *Id.,* 405 N.E.2d at 987. The decision was based not on a showing of subjective "bad faith" on the part of the secured creditor, however, but on an objective determination that if the allegations were proven true, it would mean that the debtor effectively would have "released," for no consideration, an unencumbered equity interest worth over $2 million otherwise available to unsecured creditors, *id.,* clearly a commercially unreasonable sale. *See Thomas v. Price,* 975 F.2d 231, 239 (5th Cir.1992); *see also Bezanson v. Fleet Bank—N.H.,* 29 F.3d 16, 20–21 (1st Cir.1994) (affirming finding of commercial unreasonableness where secured creditor turned down purchase offer of $3.4 million, which would have left equity for other creditors). Peters, on the other hand, failed to prove that Anson had any equity in its operating assets when Fleet foreclosed. *See supra* Section II.A.

9. Ultimately, commercial reasonableness poses a question of law, though its resolution often depends on an assessment of the constituent facts in dispute, such as the actual circumstances surrounding the particular sale (*e.g.,* sales price, bid solicitation, etc.). *See Dynalectron Corp. v. Jack Richards Aircraft Co.,* 337 F.Supp. 659, 663

Fleet maintained at trial that its decision to conduct a private sale was reasonable because the publicity attending a public sale would frighten off Tiffany's, Anson's principal client, thereby virtually assuring the failure of any successor company which acquired the Anson operating assets. Thus, Fleet plausibly reasoned that the anticipated publicity attending a nonprivate sale would tend to depress the sales price. Peters, on the other hand, failed to offer any evidence of commercial unreasonableness which dealt adequately with the justification relied upon by Fleet. Rather, Peters relied exclusively upon its proffer of testimony from Richard Clarke, a former banker who would have testified, categorically, that private foreclosure sales, at which the secured creditor solicits no third-party bids, are unreasonable *per se.*[10]

■■■ Quite the contrary, however, under the Rhode Island UCC, private sales are expressly permitted. See R.I. Gen. Laws 6A–9–504(3) (noting that "[d]isposition of the collateral may be by public or *private proceedings* ... but every aspect of the disposition including the method, manner, time, place, and terms must be commercially reasonable"). "A sale of collateral is not subject to closer scrutiny when the secured party chooses to dispose of the collateral through a private sale rather than a public sale. Indeed, the official comment to [UCC] section [9–504] indicates that private sale may be the preferred method of disposition.... The only restriction placed on the secured party's disposition is that it must be commercially reasonable." *Thomas v. Price,* 975 F.2d 231,

238 (5th Cir.1992). In order to prove the private foreclosure sale commercially unreasonable, Peters would have had to demonstrate that the means employed by Fleet did not comport with prevailing trade practices among those engaged in the same or a comparable business, see, e.g., *In re Frazier,* 93 B.R. 366, 368 (Bankr.M.D.Tenn.1988), *aff'd,* 110 B.R. 827 (M.D.Tenn.1989), whereas Clarke simply testified that *he* invariably solicited bids in foreclosure sales. Clarke did not testify that the steps taken by Fleet, confronted in October 1993 with the concern that Tiffany's might withdraw its indispensable jewelry orders, did not comport with reasonable private foreclosure practice *in such circumstances.* As to the latter point, Clarke simply stated that he did not know.

Furthermore, though Fleet may have foreclosed for any number of subjective reasons, the record indisputably discloses that it had at least one unimpeachable reason: the uncontested Anson default under the 1991 loan restructuring agreement. Consequently, we are not persuaded that the Rhode Island courts would accept the amorphous "wrongful foreclosure" claim advocated by Peters in the present circumstances. See *Carlton,* 923 F.2d at 3. Accordingly, the wrongful foreclosure claim was properly dismissed.[11]

#### c. Bulk Transfer Act (UCC § 6–102(1),(2))

■■■ Peters alleged that the sale of all Anson operating assets to C & J constituted a "bulk transfer" under the Rhode Island Bulk Transfer Act, see R.I. Gen. Laws §§ 6A–6–101, *et seq.* ("BTA"),[12] and that the

(W.D.Okla.1972). The factfinder must consider all aspects of the disposition, however, as no single factor, including the sales price, is dispositive. See *Bezanson,* 29 F.3d at 20(N.H.law); *RTC v. Carr,* 13 F.3d 425, 430 (1st Cir.1993) (Mass. law).

10. Peters now suggests that the district court misunderstood and oversimplified the Clarke testimony, and that Clarke merely meant that most reasonable private sales would need to be promoted among interested third parties *if possible.* We have reviewed the proffered Clarke testimony in its entirety, however, and find no sound basis for suggesting that the district court abused its discretion in concluding that it would have confused the jury. See *Bogosian,* 104 F.3d at 476. In other words, as we see it, a sale in which

third-party bids are actively solicited is not a "private" sale, at least absent considerations not apparent here.

11. Of course, were Fleet found to have foreclosed on the Anson assets solely to assist Considine and Jacobsen in defrauding certain of Anson's unsecured creditors, the foreclosure could prove less fruitful than Fleet supposed. See *infra* Section II.B.2(d). But that is an entirely different question than whether Fleet would be liable in tort under Rhode Island law.

12. A "bulk transfer" is "any transfer in bulk and not in the ordinary course of the transferor's business of a major part of the materials, supplies, merchandise, or other inventory, ... [as

admitted failure to give prior notification to other Anson creditors violated the BTA notice provision, thus entitling Peters to treat the entire transfer as "ineffective," *id.* § 6A–6–105. Defendants counter that the asset sale fell within an express BTA exemption because it was nothing more than a "[t]ransfer[ ] in settlement or realization of a lien or other security interests [*viz.*, Fleet's *undersecured* claim against Anson]." *Id.* § 6A–6–103(3); *cf. supra* Section II.B.2(a) (comparable "lien" exception under fraudulent transfer statute).

Parry for thrust, relying on *Starman v. John Wolfe, Inc.*, 490 S.W.2d 377 (Mo.Ct. App.1973), Peters argues that defendants are not entitled to claim the "lien" exemption under § 6A–6–103(3).[13] Peters contends, *inter alia*, that the first and third prongs in the *Starman* test were not met here. It argues that though Fleet declared a loan default in March 1993, its loan officers conceded at trial that Fleet had waived more serious defaults in the recent past and that it had not reassessed whether Anson was still in default in October 1993, *i.e.*, at the time Fleet foreclosed. Second, some of the purchase monies C & J paid for the Anson assets were not applied to Fleet's secured claim against Anson. For example, Fleet increased the purchase price for Anson's assets to cover approximately $322,000 in outstanding checks, drawn on Anson's checking account with Fleet and made payable to Anson's trade

creditors. Further, as a term of the asset sale, Fleet funnelled half a million dollars in "new capital" back into the newly created business entity, which C & J then used to pay off certain trade debts it had assumed from Anson. Both transactions violated *Starman*'s third—or anti-preference— prong, says Peters, because some, but not all, Anson unsecured creditors were paid with cash not used to reduce or extinguish the $10,628,000 Fleet debt. We cannot agree.

*Starman* poses no bar to defendants' "lien" exemption claim under U.C.C. § 6A–6–103(3). First, as we have noted, *see supra* Section II.B.2(b), Fleet declared the loan default *in March 1993* because Anson had failed to achieve its earnings target for *1992*. Thus, the very nature of the default meant that it could not be *cured* at any time after December 31, 1992, by which time 1992 year-end earnings were a *fait accompli*. Under the terms of the loan restructuring agreement, therefore, Fleet had the unilateral right to foreclose on the collateral. Furthermore, the previous Fleet waivers of default were immaterial to the question whether Fleet had a right to foreclose in October 1993, as the default it expressly declared in March 1993 was never waived.

■ Second, the circumstances surrounding the Peters claim remove it from under the third *Starman* prong.[14] In *Star-*

---

well as] a substantial part of the equipment . . . if made in connection with a bulk transfer of inventory." *Id.* § 6A–6–102(1), (2).

**13.** In *Starman*, an automobile dealership owed approximately $60,000 to a bank, which held a security interest in all dealership assets, and owed plaintiff Starman a $3,300 unsecured debt. On its own initiative, the dealership sold its entire business for $74,000 to third parties, who directly paid the bank's security interest in full, then paid over the remaining $14,000 to two other creditors of the dealership. The court held that a transferee must make three factual showings to qualify for the "lien" exemption under BTA § 103(3):(1) the transferor defaulted on a secured debt, and its secured creditor had a present right to foreclose on the transferor's assets to satisfy its lien; (2) the transferor conveyed the collateral *directly* to the secured party, rather than a third party; *and* (3) the secured party applied *all* sale proceeds to the transferor's debt, rather than remitting part of the proceeds preferentially to some (but less than all) of the transfer-

or's other unsecured creditors. *See Starman*, 490 S.W.2d at 382–83. The Missouri court found that the transferor and transferees had satisfied *none* of these criteria. *Id.*

**14.** We hasten to add, however, that Fleet incorrectly suggests that the Missouri Court of Appeals later "negated" its *Starman* holding in *Techsonic Indus., Inc. v. Barney's Bassin' Shop, Inc.*, 621 S.W.2d 332 (Mo.Ct.App.1981). Rather, *Techsonic* jettisoned only the *second prong* in the *Starman* test. A transferee would be exempt from the BTA even if the transferor conveyed the bulk assets to a third party, rather than to its secured creditor, so long as all sale proceeds were applied to the secured debt. The court rejected the proposition that the BTA requires the secured creditor and transferee to proceed with the empty formalities of a bifurcated transfer (*i.e.*, passing the assets from transferor to secured creditor, from secured creditor to third-party transferee) in order to claim the "lien exemption." Importantly, however, the *Techsonic*

*man,* and in later cases applying its third prong, *see, e.g., Mid–America Indus., Inc. v. Ketchie,* 767 P.2d 416, 418–19 (Okla.1989), the sale proceeds were more than sufficient to satisfy the secured claim *in full,* leaving *excess* proceeds. The BTA is designed to prevent transferors—like Anson—from liquidating their assets without notice to their creditors, and retaining the proceeds. Here, however, the sale price paid by C & J did not exceed the amount due Fleet on its secured claim, *see supra* Section II.A, and Fleet therefore was entitled to apply the entire purchase price toward the Anson indebtedness. That Fleet chose to devote a portion of the sale proceeds to certain Anson trade creditors did not implicate *Starman*'s third prong since those monies were never "excess" proceeds. Thus, the district court properly dismissed the BTA claim.

#### d. *Successor Liability*

Next, Peters invokes the "successor liability" doctrine, by contending that C & J is simply Anson reorganized in another guise, and therefore answerable in equity for Anson's outstanding liabilities, including the $859,068 debt due Peters in sales commissions. *See H.J. Baker & Bro. v. Orgonics, Inc.,* 554 A.2d 196 (R.I.1989).

 Under the common law, of course, a corporation normally may acquire another corporation's assets without becoming liable for the divesting corporation's debts. *See id.* at 205; *see also National Gypsum Co. v. Continental Brands Corp.,* 895 F.Supp. 328, 333 (D.Mass.1995); 15 William M. Fletcher, *Fletcher Cyclopedia of Law of Private Corporations* § 7122, at 231 (1991) [hereinafter: *"Fletcher"*]. But since a rigid nonassumption rule can be bent to evade valid claims, the successor liability doctrine

was devised to safeguard disadvantaged creditors of a divesting corporation in four circumstances. An acquiring corporation may become liable under the successor liability doctrine for the divesting corporation's outstanding liabilities if: (1) it expressly or impliedly assumed the divesting entity's debts; (2) the parties structured the asset divestiture to effect a *de facto* merger of the two corporations; (3) the divesting corporation transferred its assets with actual fraudulent intent to avoid, hinder, or delay its creditors; *or* (4) the acquiring corporation is a "mere continuation" of the divesting corporation. *See H.J. Baker,* 554 A.2d at 205 (citing, with approval, "mere continuation" test set forth in *Jackson v. Diamond T. Trucking Co.,* 100 N.J.Super. 186, 241 A.2d 471, 477 (1968) (recognizing, as distinct exceptions, both the "actual fraud" and "mere continuation" tests)); *Cranston Dressed Meat Co. v. Packers Outlet Co.,* 57 R.I. 345, 348, 190 A. 29 (1937) (noting that nonassumption rule applies only "in the absence of fraud"); *see also Golden State Bottling Co. v. NLRB,* 414 U.S. 168, 182 n. 5, 94 S.Ct. 414, 424 n. 5, 38 L.Ed.2d 388 (1973); *Western Auto Supply Co. v. Savage Arms, Inc. (In re Savage Indus., Inc.),* 43 F.3d 714, 717 n. 4 (1st Cir. 1994); *Philadelphia Elec. Co. v. Hercules, Inc.,* 762 F.2d 303, 308–09 (3d Cir.1985); *Fletcher,* at § 7122. This case implicates the third and fourth successor liability tests.

 The district court dismissed the instant successor liability claim on the ground that Peters could not have been prejudiced, because Fleet had a legitimate right to foreclose and Peters did not prove the Anson assets were worth more than the total Anson indebtedness to Fleet. On appeal, C & J takes essentially the same position, but with the flourish that the successor liability doc-

---

defendants had applied *all* sale proceeds to the secured debt, *see id.* at 334 ("[A]ll proceeds went to the bank."), and the *Techsonic* court therefore had no occasion to reconsider *Starman*'s third "anti-preference" criterion. Further, other courts have since acknowledged the continuing efficacy of the third prong in *Starman. See, e.g., Mid–America Indus., Inc. v. Ketchie,* 767 P.2d 416, 418–19 (Okla.1989) (transfer not exempt where "only a portion of the proceeds of the sale was paid to the secured creditor"); *see also Ouachita Elec. Coop. Corp. v. Evans–St. Clair,* 12

Ark.App. 171, 176–77, 672 S.W.2d 660 (1984) (finding transfer exempt where all proceeds were applied to secured debts, but expressly distinguishing *Starman* on ground that defendants had not applied all sales proceeds to secured debt); *Schlussel v. Emmanuel Roth Co.,* 270 N.J.Super. 628, 637 A.2d 944, 955 n. 5 (1994) (in dicta, endorsing *Starman*'s partial-proceeds rule); *American Metal Finishers, Inc. v. Palleschi,* 55 A.D.2d 499, 391 N.Y.S.2d 170, 173 (1977) (same); *Peerless Packing Co. v. Malone & Hyde, Inc.,* 180 W.Va. 267, 376 S.E.2d 161, 164 (1988).

trine is inapplicable *per se* where the divesting corporation's assets were acquired pursuant to an intervening foreclosure, rather than a direct purchase. *See* R.I. Gen. Laws § 6A–9–504(4) ("When collateral is disposed of by a secured party after default, the disposition transfers to a purchaser for value all of the debtor's rights therein and *discharges the security interest* under which it is made and any security interest or lien subordinate thereto. The purchaser takes free of all such rights and interests . . . .") (emphasis added). We do not agree.

■ First and foremost, existing case law overwhelmingly confirms that an intervening foreclosure sale affords an acquiring corporation no automatic exemption from successor liability. *See, e.g., Glynwed, Inc. v. Plastimatic, Inc.,* 869 F.Supp. 265, 273–75 (D.N.J. 1994) (collecting cases); *Asher v. KCS Int'l, Inc.,* 659 So.2d 598, 600 (Ala.1995); *G.P. Publications, Inc. v. Quebecor Printing–St. Paul, Inc.,* 481 S.E.2d 674, 679–80 (N.C.Ct. App.1997); *see also Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac,* 920 F.2d 1323, 1325, 1327 (7th Cir. 1990). Nor has C & J cited authority supporting its position.

■ Second, by its very nature the foreclosure process cannot preempt the successor liability inquiry. Whereas liens relate to assets (*viz.,* collateral), the indebtedness underlying the lien appertains to a person or legal entity (*viz.,* the debtor). Thus, although foreclosure by a senior lienor often wipes out junior-lien interests in the same collateral, *see, e.g., Levenson v. G.E. Capital Mortgage Servs., Inc.,* 101 Md.App. 122, 643 A.2d 505, 512 (1994), *rev'd on other grounds,* 338 Md. 227, 657 A.2d 1170 (1995), it does not discharge the debtor's underlying obligation to junior lien creditors. *See, e.g., Trustees of MacIntosh Condominium Ass'n v. FDIC,*

908 F.Supp. 58, 64 (D.Mass.1995) ("'As a result of the first mortgage foreclosure the second mortgage lien was extinguished but not the second mortgage debt.'") (quoting *Osborne v. Burke,* 1 Mass.App.Ct. 838, 300 N.E.2d 450, 451 (1973)). As one might expect, therefore, UCC § 9–504 focuses exclusively on the effect a foreclosure sale has upon subordinate liens, *see* R.I. Gen. Laws § 6A–9–504(4), *supra,* rather than any extinguishment of the underlying indebtedness. Whereas the successor liability doctrine focuses exclusively on debt extinguishment, be the debt secured or unsecured.[15]

■ Following the October 1993 foreclosure sale by Fleet, the then-defunct Anson unquestionably remained legally obligated to Peters for its sales commissions, even if the lack of corporate wherewithal rendered the obligation unenforceable as a practical matter. True, Fleet might have sold the Anson assets to an entity with no ties to Anson, but that is beside the point, since the Peters successor liability claim alleges that C & J *is* Anson in disguise. As Peters simply seeks an equitable determination that C & J, as Anson's successor, is liable for the sales commissions Peters earned from Anson, *see Glynwed,* 869 F.Supp. at 274–75, its claim in no sense implicates any lien interest in any former Anson asset. Third, successor liability is an equitable doctrine, both in origin and nature. *See, e.g., Chicago Truck Drivers, Helpers and Warehouse Workers Union (Indep.) Pension Fund v. Tasemkin, Inc.,* 59 F.3d 48, 49 (7th Cir.1995); *The Ninth Ave. Remedial Group v. Allis–Chalmers Corp.,* 195 B.R. 716, 727 (N.D.Ind.1996) ("The successor doctrine is derived from equitable principles . . . ."); *Stevens v. McLouth Steel Prods. Corp.,* 433 Mich. 365, 446 N.W.2d 95, 100 (1989); *Uni–Com N.W., Ltd. v. Argus*

---

**15.** It is for this reason that the successor liability doctrine often proves problematic in bankruptcy proceedings. In contrast to UCC § 9–504, the Bankruptcy Code expressly permits sales free and clear of liens, *and of any other "interest"* in the collateral. *See, e.g.,* 11 U.S.C. § 363(f) ("The trustee may sell property . . . free and clear of *any interest* in such property . . . .") (emphasis added); § 727 (discharge in liquidation); § 1141(d)(discharge in reorganization). Thus, arguably at least, such "interest[s]" might be thought to encompass successor liability claims by unsecured creditors. *But see, e.g., Wilkerson v. C.O. Porter Mach. Co.,* 237 N.J.Super. 282, 567 A.2d 598, 601–02 (1989) (finding successor liability doctrine applicable notwithstanding entry of § 363 order). Unlike a bankruptcy court, however, a secured creditor and its nonbankrupt debtor lack the *power*—either at common law or by statute—to effect a discharge of underlying third-party debts, even for the most beneficent of reasons.

*Publ'g Co.,* 47 Wash.App. 787, 737 P.2d 304, 314 (1987). Moreover, the UCC, as adopted in Rhode Island, *see* R.I. Gen. Laws § 6A–9–103, provides that generally applicable principles of equity, unless expressly preempted, are to supplement its provisions. *See G.P. Publications,* 481 S.E.2d at 680; *see also Ninth Dist. Prod. Credit Ass'n v. Ed Duggan, Inc.,* 821 P.2d 788, 794 (Colo.1991) (en banc); *see also Sheffield Progressive, Inc. v. Kingston Tool Co.,* 10 Mass.App.Ct. 47, 405 N.E.2d 985, 988 (1980) (UCC Article 9 does not preempt Uniform Fraudulent Conveyance Act). Moreover, R.I. Gen. Laws § 6A–9–504 neither explicitly nor impliedly preempts the successor liability doctrine.

▪ Finally, the fact that C & J acquired the Anson assets indirectly through Fleet, rather than in a direct sale from Anson, does not trump the successor liability doctrine as a matter of law, since equity is loath to elevate the form of the transfer over its substance, and deigns to inquire into its true nature. *See Glynwed,* 869 F.Supp. at 275 (collecting cases); *G.P. Publications,* 481 S.E.2d at 679–80; *see also Bangor Punta Operations, Inc. v. Bangor & Aroostook R. Co.,* 417 U.S. 703, 713, 94 S.Ct. 2578, 2584, 41 L.Ed.2d 418 (1974) ("In such cases, courts of equity, piercing all fictions and disguises, will deal with the substance of the action and not blindly adhere to the corporate form."); *Young v. Higbee Co.,* 324 U.S. 204, 209, 65 S.Ct. 594, 597, 89 L.Ed. 890 (1945) (same); *Henry F. Michell, Co. v. Fitzgerald,* 353 Mass. 318, 231 N.E.2d 373, 375–76 (1967) (same). Thus, were C & J otherwise qualified as Anson's "successor" under Rhode Island law, because its principals acted with intent to evade the Peters claim, *see infra,* there would be no equitable basis for treating the asset transfer by foreclosure differently than a direct transfer from Anson to C & J. *See A.R. Teeters & Assocs., Inc. v. Eastman Kodak Co.,* 172 Ariz. 324, 836 P.2d 1034, 1039 (1992) ("Successor liability is based upon the theory 'that the assets of a private corporation constitute a trust fund for the benefit of its creditors . . . .' ") (citation omitted). Consequently, we reject the contention that C & J's acquisition of Anson's assets through the Fleet foreclosure pursuant to R.I. Gen. Laws § 6A–9–504, warranted dismissal of the successor liability claim as a matter of law.

▪ Thus, Peters was entitled to attempt to prove that C & J, as Anson's "successor," became liable for the Anson debt to Peters because C & J is a "mere continuation" of the divesting corporate entity. *See Nissen Corp. v. Miller,* 323 Md. 613, 594 A.2d 564, 566 (1991) (" 'The [mere continuation] exception is designed to prevent a situation whereby the specific purpose of acquiring assets is to place those assets out of reach of the predecessor's creditors. In other words, the purchasing corporation maintains the same or similar management and ownership but wears a "new hat." ' ") (citation omitted). The "mere continuation" determination turns upon factfinding inquiries into five emblematic circumstances: (1) a corporation transfers its assets; (2) the acquiring corporation pays "less than adequate consideration" for the assets; (3) the acquiring corporation "continues the [divesting corporation's] business"; (4) both corporations share "at least one common officer who [was] instrumental in the transfer"; and (5) the divesting corporation is left "incapable of paying its creditors." *See H.J. Baker,* 554 A.2d at 205 (adopting, *inter alia,* the factors set forth in *Jackson,* 241 A.2d at 477).

C & J relies heavily, indeed almost exclusively, on *Casey v. San–Lee Realty, Inc.,* 623 A.2d 16 (R.I.1993), wherein the Rhode Island Supreme Court identified five factual considerations which contradicted the contention that San–Lee Realty was a "successor" corporation. *Id.* C & J then argues that all five factual considerations in *Casey* appertain here. By disregarding the distinctive procedural posture in which the *Casey* appeal presented itself, however, C & J fundamentally misdirects its reliance.

Unlike the judgment as a matter of law at issue here, the *Casey* court affirmed a judgment entered for the defendants following a bench trial in which the trial judge made factual findings directly pertinent to the "mere continuation" theory. *See id.* at 19 ("The findings of fact made by a trial justice, sitting without a jury, are to be given great weight."). Thus, *Casey* provides no support for the proposition that the particular factual

considerations credited by the trial court, *qua* factfinder, would permit a trial court, sitting with a jury, to enter judgment as a matter of law.

We emphasize the misplaced reliance on *Casey* because it points up the fundamental flaw underlying the Rule 50 dismissal below. The *Baker* court was careful to note that the "mere continuation" inquiry is multifaceted, and normally requires a cumulative, case-by-case assessment of the evidence by the factfinder. *See H.J. Baker*, 554 A.2d at 205; *see also Cranston Dressed Meat*, 57 R.I. at 350, 190 A. 29 (affirming judgment for plaintiff based on findings of fact); *Steel Co. v. Morgan Marshall Indus., Inc.*, 278 Ill.App.3d 241, 214 Ill.Dec. 1029, 1034–35, 662 N.E.2d 595, 600–01 (1996) (trialworthy issue of fact precluded directed verdict); *Burgos v. Pulse Combustion, Inc.*, 227 A.D.2d 295, 642 N.Y.S.2d 882, 882–83 (1996); *Bryant v. Adams*, 116 N.C.App. 448, 448 S.E.2d 832, 839–40 (1994) ("mere continuation" inquiry implicates issues of fact precluding summary judgment); *Bagin v. IRC Fibers Co.*, 72 Ohio App.3d 1, 593 N.E.2d 405, 408 (1991) (genuine issue of fact relating to "mere continuation" inquiry precluded summary judgment for defendant); *cf. Dickinson v. Ronwin*, 935 S.W.2d 358, 364 (Mo.Ct.App.1996) ("Although none of thé badges of fraud existing alone establishes fraud, a concurrence of several of them raises a presumption of fraud.").

Thus, although a Rule 50 dismissal may be warranted where the trial court has determined the evidence insufficient to permit a rational jury to find for the plaintiff, we are not presented with such a case. Rather, viewed in the light most favorable to Peters, *see* Fed.R.Civ.P. 50(a); *Coyante*, 105 F.3d at 21, its evidentiary proffer generated a trialworthy issue of material fact respecting all five factual inquiries identified in *H.J. Baker*, as we shall see.[16]

### (i) *"Transfer" of Assets*

 Anson transferred all its *operating assets*, thereby enabling C & J to continue the identical product line without interruption. *H.J. Baker*, 554 A.2d at 205. C & J nonetheless contends that a cognizable "transfer" could not have occurred, because Anson did not convey *all its assets* to C & J; that is, it conveyed its real property to Little Bay Realty. *See Casey*, 623 A.2d at 19 (finding no transfer where, *inter alia*, not all corporate assets were conveyed). We disagree.

 Under the first *Baker* criterion, the plaintiff need only demonstrate "a transfer of corporate assets." *H.J. Baker*, 554 A.2d at 205. That is, it is not necessary, as a matter of law, that a single corporation acquire all the divesting corporation's assets, though the relative inclusiveness of any such asset transfer may prove to be a very pertinent factual consideration which the factfinder would take into account in the *overall* mix. *Cf. Casey*, 623 A.2d at 19 (noting that divesting corporation conveyed only *three-fifths* of its assets). In this respect, *Baker* accords with the law in other jurisdictions. *See, e.g., G.P. Publications*, 481 S.E.2d at 679 (successor liability doctrine concerns "the purchase[ ] of all or *substantially all* the assets of a corporation"); *cf. Dickinson*, 935 S.W.2d at 364 (recognizing, as badge of fraud, "the transfer of all or *nearly all* of the debtor's property") (emphasis added); *supra* note 7.

Yet more importantly, however, this is not an instance in which the divesting corporation transferred its real estate to a third corporation which was beyond the *de facto* control of the principals of the corporation which acquired the operating assets.[17] Con-

16. Since the district court judgment must be vacated in any event, we assume *arguendo* that Rhode Island law would require Peters to make adequate showings on all five *Baker* factors, even though *Baker* expressly adopted the New Jersey model for the "mere continuation" test, under which "[n]ot all of these factors need be present for a *de facto* merger or continuation to have occurred." *Luxliner P.L. Export, Co. v. RDI/Luxliner, Inc.*, 13 F.3d 69, 73 (3d Cir.1993) (citing *Good v. Lackawanna Leather Co.*, 96 N.J.Super. 439, 233 A.2d 201, 208 (1967)). Indeed, the *Baker* court itself did not even discuss the "inadequate consideration" element in arriving at its determination that the acquiring company qualified as a "successor." *See H.J. Baker*, 554 A.2d at 205.

17. Rather, the ostensible purpose was to immunize Little Bay from a possible *C & J* failure, which likewise explains why the October 1993

sidine and Jacobsen deliberately structured the overall transaction so as to keep the Anson operating assets and real property under the ownership of two separate entities, C & J and Little Bay Realty respectively, concurrently established and controlled by them. Once again, therefore, since the successor liability doctrine is equitable in nature, it is the substance of the overall transaction which controls, rather than its form. *See Glynwed,* 869 F.Supp. at 275. Thus, the fact that C & J leased the real property from Little Bay is not controlling, since C & J (through Considine and Jacobsen) retained *de facto* control of the former Anson real estate following its transfer to Little Bay. *See, e.g., H.J. Baker,* 554 A.2d at 205 (focusing on fact that two companies "operated from the same manufacturing plant," not on whether they both owned the premises). Accordingly, viewing the evidence in the light most favorable to Peters, we cannot conclude, as a matter of law, that no cognizable "transfer" occurred.

### (ii) *"Inadequate Consideration "*

Peters likewise adduced sufficient evidence from which a rational jury could conclude that the operating assets were transferred to C & J for "inadequate consideration." *Id.* The second *Baker* factor rests on the theory that inadequate consideration is competent circumstantial evidence from which the factfinder reasonably may infer that the transferor harbored a fraudulent intent to evade its obligations to creditors. *See, e.g., Ricardo Cruz Distribs., Inc. v. Pace Setter, Inc.,* 931 F.Supp. 106, 110 (D.P.R. 1996) ("a fraudulent transfer of property from the seller to the buyer, *evinced by* inadequate consideration for the transfer"); *Casey Nat'l Bank v. Roan,* 282 Ill.App.3d 55, 218 Ill.Dec. 124, 127, 668 N.E.2d 608, 611 ("Proof of fraud in fact requires a showing of an actual intent to hinder creditors, while fraud in law presumes a fraudulent intent when a voluntary transfer is made for no or inadequate consideration and directly impairs

the rights of creditors."), *appeal denied,* 169 Ill.2d 564, 221 Ill.Dec. 436, 675 N.E.2d 631 (1996); *cf. Dickinson,* 935 S.W.2d at 364 (recognizing "inadequacy of consideration" as badge of fraud); *supra* note 7. On the other hand, a valuable consideration negotiated at arm's-length between two distinct corporate entities normally is presumed "adequate," particularly if the divesting corporation's creditors can continue to look to the divesting corporation and/or the sales proceeds for satisfaction of their claims. *See A.R. Teeters,* 836 P.2d at 1040; *see also Arch Mineral Corp. v. Babbitt,* 894 F.Supp. 974, 986 n. 11 (S.D.W.Va.1995) (one inquiry is whether divesting corporation *retains* sufficient assets from which to satisfy creditor claims), *aff'd,* 104 F.3d 660 (1997); *Eagle Pac. Ins. Co. v. Christensen Motor Yacht Corp.,* 85 Wash. App. 695, 934 P.2d 715, 721 (1997) (inquiring whether divesting corporation is "left unable to respond to [the] creditor's claims").

The total consideration for all Anson assets in this case was less than $500,000.[18] Fleet effectively wrote off its outstanding balances ($10,628,000) on the Anson loan in 1993, and provided C & J and Little Bay Realty "new" financing totaling approximately $2.9 million. *See* Fleet Credit Memo (10/14/93), at 4 ("This [agreement] is to involve forgiveness of *some* of [Fleet's] legal balance in conjunction with a significant equity injection.") (emphasis added). Thus, though normally loans obtained by buyers to finance asset acquisitions would be considered in calculating the total consideration paid, here the two newly-formed acquiring companies actually incurred no "new" indebtedness to Fleet. In fact, if the two companies were determined to be Anson's "successors," the asset sale would have gained them loan forgiveness approximating $7.728 million (*i.e.,* $10,628,000, less new indebtedness of only $2.9 million), given their total exoneration from Anson's preexisting indebtedness to Fleet. Since the "new" Fleet loans cannot count as "consideration," at least as a matter of law, C & J and

---

agreement contemplated no cross-collateralization.

**18.** Because the conveyances to C & J and Little Bay allegedly comprised part of an integrated scheme to defraud certain Anson creditors, we

weigh the total consideration involved in both transactions. Our conclusion would be precisely the same, however, were we to consider only the operating-assets sale to C & J.

Little Bay paid a combined total of only $1 million in additional cash consideration for the Anson operating assets and real estate, of which $550,000 was immediately reinjected into the two acquiring companies for capital improvements and debt service. *See supra* Section I. As a practical matter, therefore, C & J and Little Bay acquired all the Anson assets for only $450,000.[19]

Although Peters utterly failed to demonstrate that the Anson assets were worth as much as $12,738,000, *see supra* Section II.A., it nevertheless adduced competent evidence as to their *minimum value*. Thus, the trial record would support a rational inference that the assets transferred by Anson had a fair value of just under $4 million. Fleet documents indicate that the book value of the operating assets approximated $5.2 million; Fleet's conservative estimate of their value approximated $2.11 million; and its conservative valuation of the real property was $1.78 million. Therefore, with a total *minimum* asset value just under $4 million, and a *de facto* purchase price below $500,000, a rational jury could conclude that C & J and Little Bay acquired the Anson assets at 12.5 cents on the dollar.

At these minimal levels, adequacy of consideration presents an issue for the factfinder. *See Nisenzon v. Sadowski,* 689 A.2d 1037, 1042–43 (R.I.1997) (under R.I. fraud conveyance statute, adequacy of consideration is for factfinder, and reviewable only for clear error); *see also Pacific Gas & Elec. Co. v. Hacienda Mobile Home Park,* 45 Cal. App.3d 519, 119 Cal.Rptr. 559, 566 (1975) ("Adequacy of consideration is a question of fact to be determined by the trier of fact."); *Gaudio v. Gaudio,* 23 Conn.App. 287, 580 A.2d 1212, 1221 (1990) ("[T]he adequacy of the consideration in an action to set aside a fraudulent conveyance is an issue of fact."); *Textron Fin. Corp. v. Kruger,* 545 N.W.2d

880, 884 (Iowa.Ct.App.1996) ("We refrain, however, from adopting any mathematical rules to determine the adequacy of consideration. All the facts and circumstances of each case must be considered."). On the present record, therefore, it was error to determine as a matter of law that no rational factfinder could conclude that 12.5% of fair value was "inadequate" consideration for the Anson assets. *See, e.g., Miner v. Bennett,* 556 S.W.2d 692, 695 (Mo.Ct.App.1977) ("The assumption by the grantees of the mortgages in an amount equal to approximately *one fourth* of the value of the property was not an adequate consideration for the transfer.") (emphasis added).

 Moreover, even assuming *arguendo* that the circumstantial evidence of fraudulent intent presented by Peters, in the way of demonstrating "inadequate consideration," could not have survived the Rule 50(a) motion for judgment as a matter of law, Peters adduced competent direct evidence of *actual* fraudulent intent as well. Actual fraud is a successor liability test entirely independent of the circumstantial "mere continuation" test. *See H.J. Baker,* 554 A.2d at 205 (describing "mere continuation" test as "*[a]n* exception," not as "the" exception, to the general rule of "nonassumption"; citing, with approval, *Jackson,* 241 A.2d at 477, which recognized the "actual fraud" test as distinct from the "mere continuation" test, *see id.* at 475);[20] *Cranston Dressed Meat,* 57 R.I. at 348, 190 A. 29 (noting that "nonassumption" presumption applies only "in the absence of fraud"); *see also Joseph P. Manning Co. v. Shinopoulos,* 317 Mass. 97, 56 N.E.2d 869, 870 (1944) (UFCA case) ("[A]t common law, if the conveyance is made and received for the purpose of hindering, delaying or defrauding creditors it is fraudulent and can be set aside without regard to the

**19.** The district court implied that the fact that Considine and Jacobsen injected new capital into the two acquiring companies was dispositive of the "mere continuation" inquiry. We cannot agree, however, that an injection of new capital at these minimal levels precluded a finding of fraudulent intent as a matter of law. Rather, assuming the reconfigured business were to escape, *inter alia,* the $859,068 debt due Peters, the $450,000 invested by Considine and Jacobsen

could be considered quite a bargain. Finally, the remaining $550,000 in new capital was directed back into the C & J and Little Bay coffers, where it served as an immediate benefit to Considine and Jacobsen, not a detriment.

**20.** *Baker* focused on the "mere continuation" test simply because there was no evidence of actual fraudulent intent.

nature or amount of consideration."); *Eagle Pacific*, 934 P.2d at 721 (noting that, besides the separate "mere continuation" theory, "[s]uccessor liability may also be imposed where the transfer of assets is for the fraudulent purpose of escaping liability").

 Peters adduced *direct* evidence that Considine and Jacobsen entered into the asset transfer with the specific intent to rid the business of all indebtedness due entities not essential to its future viability, including in particular the Peters sales commissions. Peters notified Anson in March 1993 that it intended to pursue Anson vigorously for payment of its sales commissions. *See Dickinson*, 935 S.W.2d at 364 (recognizing, as badge of fraud, "transfers in anticipation of suit or execution"); *supra* note 7. The intention to evade the Peters debt is explicitly memorialized in Jacobsen's notes, and yet more explicitly in the May 5, 1993 memo from Considine to Fleet ("If Fleet can find a way to foreclose the company [*viz.*, on its security interests in Anson's real estate and operating assets] and sell certain assets to our company that would eliminate most of the liabilities discussed above, then we would offer Fleet ... $3,250,-000."). Thereafter, Fleet presciently forewarned Considine that its counsel was "not convinced that you will be able to do this [*i.e.*, shed the Peters debt] without inviting litigation," and then insisted on an indemnification clause from C & J should any such litigation eventuate, *see* Credit Agreement ¶ 8.10 (Oct. 26, 1993). Moreover, it is immaterial whether Considine believed that this evasive maneuver was essential to ensure the solvency and success of the Anson business; fraudulent intent need not be malicious. *See Balzer & Assocs., Inc. v. The Lakes on 360, Inc.*, 250 Va. 527, 463 S.E.2d 453, 455 (1995) ("[M]alicious intent is not an element required to prove the voidability of the transfer.").[21]

21. Once again in mistaken reliance on *Casey*, C & J points out that the *Casey* court found no evidence of fraudulent intent. However, that determination was based on a finding that the original transferor had no knowledge of the plaintiff's potential lawsuit at the time of the asset transfer; hence, could not have effected the transfer with fraudulent intent to evade the debt it owed the plaintiff. *See Casey*, 623 A.2d at 19. The *Casey* court expressly noted, however, that

### (iii) *"Continuation of Business"*

 Furthermore, Peters proffered ample evidence on the third factor in the *Baker* test, by demonstrating that C & J did "continue [Anson's] business." *H.J. Baker*, 554 A.2d at 205. Among the considerations pertinent to the business continuity inquiry are: (1) whether the divesting and acquiring corporations handled identical products; (2) whether their operations were conducted at the same physical premises; and (3) whether the acquiring corporation retained employees of the divesting corporation. *See id.; see also Bagin*, 593 N.E.2d at 407 ("The gravamen of the 'mere continuation' exception is whether there is a continuation of the corporate entity. Indicia of the continuation of the corporate entity would include the same employees, a common name, the same product, the same plant.") (citation omitted).

C & J was incorporated in October 1993 for the specific purpose of acquiring the assets of the then-defunct Anson. *See Asher*, 659 So.2d at 599–600 (noting relevance of fact that divesting corporation ceased business operations soon after asset transfer, then liquidated or dissolved); *Steel Co.*, 214 Ill. Dec. 1029, 662 N.E.2d at 600 (noting significance of circumstantial evidence that acquiring corporation "was incorporated on the same day that [predecessor] ceased...."). Peters adduced evidence that C & J not only continued manufacturing the same jewelry products as Anson, *see H.J. Baker*, 554 A.2d at 205 (noting that two companies "sold virtually identical [ ] products"), but conducted its manufacturing at the same physical premises and continued servicing Anson's principal customer, Tiffany's. Moreover, its uninterrupted continuation of the Anson manufacturing business was prominently announced to *Anson's customers* in an October 1993 letter from C & J. *See Glynwed*, 869 F.Supp.

"the consideration in this case would not have validated a transfer of assets if the transfer were made with notice of the existence of a claim of a creditor." *Id.* at 19 n. 4. Not only is it undisputed that the C & J principals knew of the Peters claim prior to October 1993, but Peters adduced direct evidence that the asset transfer was structured with the specific intent to evade the Peters debt.

at 277 (purchasing corporation "held itself out to the world ' "as the effective continuation of the seller." ' ") (citations omitted); *Kleen Laundry & Dry Cleaning Servs., Inc. v. Total Waste Mgt., Inc.*, 867 F.Supp. 1136, 1142 (D.N.H.1994) ("This seamless client transfer reveals that the defendant purchased and operated a complete business and, in so doing, tacitly held itself out to the public as the continuation of [ ] Portland Oil."); *cf. United States v. Mexico Feed & Seed Co.*, 764 F.Supp. 565, 573 (E.D.Mo.1991) (noting that the acquiring corporation continued production of the same product lines and held itself out to the public as a continuation of the divesting corporation), *aff'd in relevant part*, 980 F.2d 478, 488 (8th Cir.1992). In its October 1993 letter, C & J stated that it had "acquired all of the assets of Anson," that it was its "intention to build on [Anson's '55–year heritage of quality'] to reestablish the Anson brand as the pre-eminent one [in the jewelry market]," and that C & J had therefore *"retained all of the former Anson employees* [including Anson's 'current retail sales representation']—the core of any business." (Emphasis added.) *See H.J. Baker*, 554 A.2d at 205; *see also Cyr v. B. Offen & Co., Inc.*, 501 F.2d 1145, 1153–54 (1st Cir. 1974) (same employees continued to produce same products in same factory); *Mexico Feed*, 764 F.Supp. at 572 (noting relevance of finding that acquiring entity retained "same supervisory personnel" or "production facilities"). Finally, in order to facilitate the product-line continuation, C & J specifically assumed responsibility for, and paid off, all indebtedness due Anson's "essential" trade creditors. *See Asher*, 659 So.2d at 600 (noting that "purchasing corporation [expressly] assumed those liabilities and obligations of the seller [*e.g.*, trade debts] ordinarily necessary for the continuation of the [seller's] normal business operations"). Thus, the Peters proffer handily addressed the third factor in the *Baker* inquiry.

### (iv) *Commonality of Corporate Officers*

 Fourth, Peters adduced sufficient evidence at trial that C & J and Anson had "at least one common officer [*viz.*, Considine or Jacobsen] who [was] instrumental in the [asset] transfer." *H.J. Baker*, 554 A.2d at

205. C & J responds, inappositely, that the respective ownership interests held by the principals in the divesting and acquiring corporations were not identical, as Considine owned 52% of the Anson stock, whereas Jacobsen and the Considine Family Trust were equal shareholders in C & J.

The present inquiry does not turn on a complete identity of *ownership* (*i.e.*, *shareholders*), however, but on a partial identity in the corporate managements (*i.e.*, "officers"). Thus, the fact that Jacobsen not only held a corporate office in both Anson and C & J but was instrumental in negotiating the asset transfer to C & J was sufficient in itself to preclude a Rule 50 dismissal under the fourth prong, even if he were not an Anson shareholder. *See H.J. Baker*, 554 A.2d at 205 (noting that "the management [of the two companies] remained substantially the same").

Further, the same result obtains even if we were to assume that the "one common officer"—referred to in *Baker*—must be a shareholder as well. Prior to *Baker*, the Rhode Island Supreme Court did not require complete identity between those who "controlled" the two corporations or the asset transfer, whether their "control" derived from stock ownership or from their management positions. For example, the court had upheld a judgment for plaintiff, following trial, even though the officers and incorporators of the divesting and acquiring corporations were not the same, on the ground that the *principals* involved in the sale "all had a[ ] [common] interest in the transaction." *Cranston Dressed Meat*, 57 R.I. at 349, 190 A. 29; *cf. Casey*, 623 A.2d at 19 (finding no successor liability where two corporations shared *no* stockholders, officers, or directors); *cf. also Glynwed*, 869 F.Supp. at 277 ("[C]ontinuity of ownership, not uniformity, is the test."); *Park v. Townson & Alexander, Inc.*, 287 Ill.App.3d 772, 223 Ill.Dec. 163, 166, 679 N.E.2d 107, 110 (1997) ("We note that the continuity of shareholders necessary to a finding of mere continuation does not require complete identity between the shareholders of the former and successor corporations."). Considine easily fits the bill here. After all, "C & J" stands for something and Jacobsen

conceded at trial that Considine "participates in the management of C & J Jewelry." Moreover, Considine admitted that no C & J decision could be taken without Considine's prior approval.

■ C & J heavily relies as well on the fact that Considine, individually, held no direct ownership interest in C & J, but instead had conveyed his interest to the Considine Family Trust. Once again, however, as equity looks to substance not form, *see Glynwed*, 869 F.Supp. at 275, the fact that Considine established a family trust to receive his ownership interest in C & J did not warrant a Rule 50 dismissal, especially in light of his concession that he actively participates in the management of C & J. *See* Fleet Credit Memo (10/14/93), at 1 ("[T]hese transactions will be considered a Troubled Debt Restructure ('TDR') because of Considine's effective control of the assets both before and after the contemplated transaction."); *id.* at 14 (noting that Considine would be a "Principal" of C & J, although his "involvement in day-to-day operations will be limited"). Moreover, such intra-family transfers may be nominal only, and thus may constitute circumstantial evidence of a fraudulent, manipulative intent to mask the continuity in corporate control. *See Park*, 223 Ill.Dec. 163, 679 N.E.2d at 110 ("[W]hile the spousal relationship between the owners of the corporations does not in itself establish a continuity of shareholders, it is certainly a factor which can be considered."); *The Steel Co.*, 214 Ill. Dec. 1029, 662 N.E.2d at 600 ("We cannot allow the law to be circumvented by an individual exerting control through his spouse."); *Hoppa v. Schermerhorn & Co.*, 259 Ill.App.3d 61, 196 Ill.Dec. 877, 881, 630 N.E.2d 1042, 1046 (1994) (noting that the fact that former joint tenant shareholder's interest was reduced to 2%, and that an additional family member was shareholder of successor corporation, did not preclude finding of continuity); *cf. Dickinson*, 935 S.W.2d at 364 (recognizing "a conveyance to a spouse or near relative" as a badge of fraud); *supra* note 7 ("The debtor retained possession or *control* of the property"). Focusing on the transactional substance, rather than its form, therefore, we cannot conclude that a rational factfinder could not decide that Considine used the family trust to camouflage his ultimate retention of control over the Anson jewelry manufacturing business which C & J continued to conduct, without interruption, after Anson's demise. *See National Gypsum*, 895 F.Supp. at 337 ("The intended result in all cases is the same, to permit the owners of the selling corporation to avoid paying creditors *without losing control* of their business.") (emphasis added).

### (v) *Insolvency of Divesting Corporation*

Finally, C & J does not dispute that Anson is a defunct corporation, consequently unable to pay its debt to Peters. *See Nelson v. Tiffany Indus.*, 778 F.2d 533, 535–36 (9th Cir.1985) ("Justification for imposing strict liability upon a successor to a manufacturer ... rests upon ... the virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business."); *The Ninth Ave. Remedial Group*, 195 B.R. at 727 ("The successor doctrine is derived from equitable principles, and it would be grossly unfair, except in the most exceptional circumstances, to impose successor liability on an innocent purchaser when the predecessor is fully capable of providing relief. . . .").[22]

■ Accordingly, since the Peters proffer, at the very least, generated a trialworthy dispute under each of the five *Baker* factors, the Rule 50 motion was improvidently granted.[23]

### e. *Tortious Interference with Contract*

■ The tortious interference claim alleges that Fleet and Considine acted in con-

---

22. Anson retained but one asset—the keyman life insurance policy—under which Fleet, not Anson, was the named beneficiary. *See supra* Section II.A.3(b).

23. Peters did not name Fleet in the successor liability count proper, nor seek to amend its complaint when the omission was brought to its attention at trial. Consequently, we deem any independent claim against Fleet abandoned. *See Rodriguez v. Doral Mortgage Corp.*, 57 F.3d 1168, 1172 (1st Cir.1995) (abjuring trial by ambush).

cert not only to extinguish the debt Anson owed Peters for sales commissions, but caused Anson and C & J to displace Peters prematurely as the sales representative for the Tiffany's account. The parties agree that the tortious interference claim required that Peters prove: (1) a sales-commission contract existed between Anson and Peters; (2) Fleet and Considine intentionally interfered with the sales-commission contract, and (3) their tortious actions damaged Peters. *See Jolicoeur Furniture Co. v. Baldelli,* 653 A.2d 740, 752 (R.I.), *cert. denied,* —— U.S. ——, 116 S.Ct. 417, 133 L.Ed.2d 335 (1995); *Smith Dev. Corp. v. Bilow Enters., Inc.,* 112 R.I. 203, 308 A.2d 477, 482 (1973). With respect to the first and third prongs, there is no dispute that Fleet and Considine knew of the Peters contract to serve as Anson's sales representative to Tiffany's, or that Peters sustained damages due to the premature termination of its sales-commission contract, without receiving payment for its outstanding commissions.

▪ With respect to the disputed second criterion (*viz.,* intent), Peters need only establish that Fleet or Considine acted with "legal malice—an intent to do harm *without justification." Mesolella v. City of Providence,* 508 A.2d 661, 669–70 (R.I.1986) (emphasis added); *see Friendswood Dev. Co. v. McDade + Co.,* 926 S.W.2d 280, 282 (1996) (noting that defendant may assert defense of "justification," by demonstrating that the alleged interference was merely an exercise of its own superior or equal legal rights, or a good-faith claim to a colorable albeit mistaken legal right); *see also Shaw v. Santa Monica Bank,* 920 F.Supp. 1080, 1087 (D.Haw. 1996); *Greenfield & Co. of N.J. v. SSG Enters.,* 213 N.J.Super. 1, 516 A.2d 250, 257 (1986). Proof of "[actual] [m]alice, in the sense of spite or ill will, is not [only not] required," *Mesolella,* 508 A.2d at 669–70, it is immaterial, *see Texas Beef Cattle Co. v. Green,* 39 Tex.Sup.Ct. 523, 921 S.W.2d 203, 211 (1995) ("[I]f the trial court finds as a matter of law that the defendant had a legal right to interfere with a contract, then the defendant has conclusively established the justification defense, and the motivation behind assertion of that right is irrelevant."); *see also Belden Corp. v. InterNorth, Inc.,* 90 Ill.App.3d 547, 45 Ill.Dec. 765, 768 n. 1, 413 N.E.2d 98, 101 n. 1 (1980); *Kwan–Sa You v. Roe,* 97 N.C.App. 1, 387 S.E.2d 188, 192 (1990).

▪ Since the successor liability claim was dismissed improvidently, *see supra* Section II.B.2(d), the tortious interference claim against Considine should have been submitted to the jury as well. Since a party normally cannot "interfere" with his own contract, *see Baker v. Welch,* 735 S.W.2d 548, 549 (Tex.App.–Houston (1 Dist.)1987), Considine's status as Anson's CEO and controlling shareholder is pertinent. As its contracting agent, Considine *is* Anson, and thus had a qualified privilege to terminate the Peters contract.

▪ Nonetheless, specialized rules apply to tortious interference claims against corporate agents. Agency liability is precluded only if the agent either acted in the "best interests" of its principal (*viz.,* Anson), *see Texas Oil Co. v. Tenneco, Inc.,* 917 S.W.2d 826, 831–32 (Tx.App.–Houston (1 Dist.)1994), or, at the very least, did not act solely to advance his own personal interests, *see Stafford v. Puro,* 63 F.3d 1436, 1442 (7th Cir. 1995) ("Directors and officers are not justified in acting solely for their own benefit or solely in order to injure the plaintiff because such conduct is contrary to the best interests of the corporation."); *Powell v. Feroleto Steel Co.,* 659 F.Supp. 303, 307 (D.Conn.1986); *Phillips v. Montana Educ. Ass'n,* 187 Mont. 419, 610 P.2d 154, 158 (1980); *see also Holloway v. Skinner,* 898 S.W.2d 793, 796 (Tex. 1995) (noting that the personal benefit exception is the logically necessary corollary to the "rule that a party cannot tortiously interfere with its own contract").

Since Anson was insolvent, *see infra* Section II.B.2(f), Considine's own investment in Anson was negligible at best, and the trial record discloses that he not only acted intentionally to evade Anson's obligation to Peters, but at the same time negotiated for himself a $200,000 consulting fee. Thus, the circumstantial evidence and the Considine memoranda to Fleet generated a trialworthy issue as to whether Considine acted with "legal malice." *See Mesolella,* 508 A.2d at

669–70; *see, e.g., Dallis v. Don Cunningham & Assocs.*, 11 F.3d 713, 717–18 (7th Cir.1993) (upholding jury verdict against corporate officer who had directed corporation not to pay plaintiff his sales commissions, and where the officer's "own compensation ... skyrocketed" during the relevant time period); *see also, e.g., Chandler v. Bombardier Capital, Inc.*, 44 F.3d 80, 83 (2d Cir.1994) (upholding jury verdict against corporate officer who induced plaintiff's dismissal, then personally took charge of plaintiff's department). This is not a call the district court could make on a motion for judgment as a matter of law.

■ On the other hand, the tortious interference claim against Fleet fails because Peters did not name Fleet as a defendant in this count, nor move to amend when Fleet brought the omission to Peters' attention. *Cf.* supra note 23. Even if Peters had not abandoned its claim, moreover, it cites *no* apposite supporting case law. *See Carlton,* 923 F.2d at 3 (plaintiff who selects federal forum not entitled to trailblazing interpretations of state law). Fleet unquestionably had a valid legal right to foreclose on Anson's assets in March 1993, and the total Anson indebtedness to Fleet exceeded the proven value of the Fleet collateral. As this constituted an independent and legally sufficient "justification" for the Fleet foreclosure, a finding of "legal malice" appears to have been precluded as a matter of law. *See Friendswood Dev.*, 926 S.W.2d at 282 ("justification" is the exercise of one's own legitimate legal rights); *cf. Keene Lumber Co. v. Leventhal,* 165 F.2d 815, 820 (1st Cir.1948) (finding tortious interference where defendants made false representations to unsecured creditor, and attempted to avoid the unsecured creditor's claims by foreclosing upon *sham* chattel mortgages).

#### f. Breach of Fiduciary Duty

■ Finally, Peters claims that Considine breached a fiduciary duty to Peters, since the value of the shareholders' investment in an insolvent company is negligible, and the corporation's directors thereafter become trustees of "the *creditors* to whom the [company's] property ... must go." *Olney v. Conanicut Land Co.,* 16 R.I. 597, 599, 18 A. 181

(1889) (emphasis added); *see Unsecured Creditors' Comm. v. Noyes (In re STN Enters.)*, 779 F.2d 901, 904–05 (2d Cir.1985); *Association of Mill and Elevator Mut. Ins. Co. v. Barzen Int'l, Inc.*, 553 N.W.2d 446, 451 (Minn.Ct.App.1996); *Whitley v. Carolina Clinic*, 118 N.C.App. 523, 455 S.E.2d 896, 900 (1995). Considine responds that Peters failed to establish that he converted any of the Anson assets to his personal use, and further that he could not have done so, because Fleet had a comprehensive lien on all operating assets. We disagree.

■ A breach of fiduciary duty need not amount to a conversion in order to be actionable. "[D]irectors and officers [of insolvent corporations] may not pursue personal endeavors inconsistent with their duty of undivided loyalty to ... the corporations' stockholders and creditors." *American Nat'l Bank of Austin v. MortgageAmerica Corp. (In re MortgageAmerica Corp.)*, 714 F.2d 1266, 1276 (5th Cir.1983); *see National Credit Union Admin. Bd. v. Regine,* 749 F.Supp. 401, 413 (D.R.I.1990) (as a fiduciary, director must "place the interests of the corporation before his own personal interests"). Whereas, the present record discloses, for example, that Considine negotiated a $200,000 consulting fee for himself as part of the October 1993 agreement, *see supra* Section I, and Peters received nothing. Therefore, the jury must determine whether Considine breached his duty as an Anson director:

> If, then, the director be a trustee, or one who holds a fiduciary relation to the creditors, in case of insolvency he cannot take advantage of his position for his own benefit to their loss. The right of the creditor does not depend on fraud or no fraud, but upon the fiduciary relationship.

*Olney,* 16 R.I. at 602, 18 A. 181.

■ In addition, Peters maintained, without citing to Rhode Island authority, that Fleet must be held answerable for inducing Considine to breach his fiduciary duty to the bypassed Anson creditors. Fleet correctly counters that it cannot be held liable, however, since its comprehensive lien on the Anson operating assets precludes a finding that Peters was a "creditor[ ] to whom the [compa-

ny's] property ... must go." *Olney*, 16 R.I. at 599, 18 A. 181. Moreover, even assuming the Rhode Island courts were to recognize such a cause of action, Peters would have had to show that: (1) Considine breached a fiduciary duty; (2) Fleet knowingly induced or participated in the breach; and (3) Peters sustained damages from the breach. *Whitney v. Citibank, N.A.*, 782 F.2d 1106, 1115 (2d Cir.1986). We are unable to discern how Peters could succeed on a tortious inducement-to-breach claim which is essentially "analogous to a cause of action for intentional interference with contractual relations." *Id.* Thus, for the reasons discussed in relation to the tortious interference claim against Fleet, *see supra* Section II.B.2(e), we affirm the dismissal of the present claim as well.

## III

### CONCLUSION

Accordingly, the district court judgment is affirmed insofar as it dismissed all claims against Fleet; the judgments in favor of C & J and Considine are affirmed, except for the successor liability claim against C & J and the claims for tortious interference with contract and breach of fiduciary duty against Considine, which claims are remanded to the district court for further proceedings consistent with this opinion.[24]

*SO ORDERED.*

---

24. We note also that though we have adverted to various numerical figures, drawn from the trial record, to demonstrate in broad outline that Peters did generate trialworthy factual disputes appropriately left to the trier of fact, we do not suggest that the court, on remand, is in any way bound by these figures, as distinguished from the legal principles espoused in our opinion.